## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| GARTNER, INC., a Delaware corporation, )<br><br>Plaintiff, )<br><br>v. )<br><br>THE HACKETT GROUP, INC., a Florida corporation, JEFFREY FARAMO, an individual, and JOHN VAN DECKER, an individual, )<br><br>Defendants. ) | Civil No. _____<br><br><br><br>May 26, 2023 |

## COMPLAINT

Plaintiff Gartner, Inc. ("Gartner") for its Complaint against Defendants The Hackett Group Inc. ("Hackett") and Jeffrey Faramo ("Faramo") and John Van Decker ("Van Decker") (the "Individual Defendants" and with Hackett, collectively, the "Defendants") states as follows:

## INTRODUCTION

1.       In an effort to "jump the line" in order to unlawfully compete, Hackett is targeting high-level and long-tenured Gartner leaders in both sales and research to grow its "market intelligence and syndicated research" business segment.  In recent months, Hackett has been increasingly vocal about its "transformative business plan" centered around its "market intelligence" offerings, as well as its "aggressive sales hiring" to achieve this goal.  And with this transformation, Hackett is brazenly picking off top Gartner talent to unfairly build a competitive business. In so doing, Hackett has unlawfully induced the Individual Defendants to breach their respective contracts with Gartner and is seeking to leverage Gartner's trade secrets.

2.      For their part, Faramo and Van Decker defected from Gartner to join Hackett and help it build and expand this directly competing business.  Faramo and Van Decker are separately armed with the tools, experience, and Gartner information needed to build Hackett's competing business.

3.      Faramo served in sales leadership roles at Gartner for nearly 20 years.  Faramo knows and understands every aspect of Gartner's sales methodology and the secret to Gartner's success.  Faramo also had access to Gartner's proprietary research offerings, client information, client feedback, internal data, research and forecasting informing market and client trends and ways to drive demand for Gartner's products.  Faramo was also intimately involved in discussions regarding new product strategy and forward-looking strategic planning.

4.      Faramo went as far as to email numerous confidential, proprietary and highly sensitive Gartner documents containing such information to his personal email address in the month preceding his resignation. These documents contained information regarding: (1) Gartner's sales methodology, (2) Gartner's actual sales training programs and various metrics, (3) Gartner's internal research,  (4) Gartner's strategies regarding market growth, and (5) Gartner's strategies to create demand for prospects in the marketplace.

5.      Faramo is primed to leverage this information to grow Hackett's sales organization for its market intelligence and syndicated research business.

6.      Van Decker served as a Vice President, Analyst at Gartner for nearly 15 years.  Van Decker had access to and knowledge of nearly every aspect of Gartner's Research and Advisory business (with which Hackett seeks to compete) for the markets in which he worked.  Gartner viewed Van Decker as not only an expert in his various fields, but also an "anchor" for Gartner's business in these markets.

7.    As a Gartner Analyst, Van Decker built important and long-standing relationships with various clients, prospects, and vendors, giving him prime access to market research, feedback, and market trends.  He also gained intimate knowledge of Gartner's clients by conducting, developing, and reviewing research via client, vendor and analyst networking, as well as evaluating and analyzing information and participating in research meetings and other activities for over a decade.

8.    Van Decker's employment with Hackett directly complements Faramo's in that he brings the same level of analyst expertise as Faramo's sales expertise.  Hackett, Faramo and Van Decker are creating a directly competing business to poach Gartner clients, erode its competitive edge, and steal its market share.

9.    Hackett strategically hired Faramo and Van Decker to leverage their Gartner experience and knowledge.  In doing so, Hackett intentionally interfered with Faramo's and Van Decker's valid and enforceable Gartner employment agreements.  Faramo and Van Decker knowingly breached their respective agreements, and continue to do so, putting Gartner's confidential and trade secret information at risk.

10.    Defendants' unlawful actions must be enjoined before they can cause further irreparable harm to Gartner's legitimate business interests, including its trade secrets, proprietary and confidential information, and client and employee relationships.

## **PARTIES**

11.    Gartner, Inc. is a Delaware corporation with its principal place of business located at 56 Top Gallant Road, Stamford, Connecticut 06902.

12.    Hackett is a Florida corporation.  Hackett lists its principal address as 1001 Brickell Bay Drive, Suite 3000, Miami, FL 33131.

13.     Jeffrey Faramo is a former Gartner employee.  Upon information and belief, Faramo is a Florida resident.  At all times relevant to this Complaint, Faramo performed work for Gartner in Connecticut.  During his Gartner tenure, Faramo reported to Marcio Krug, who is located in Connecticut.  Faramo also regularly worked and interacted with Connecticut-based employees.  Faramo also entered into an employment agreement with Gartner in 2022, which is governed by Connecticut law and contains Connecticut forum and choice of law provisions.

14.     John Van Decker is a former Gartner employee.  Upon information and belief, Van Decker is a Florida resident.  At all times relevant to this Complaint, Van Decker performed work for Gartner, a Connecticut-based company.  Van Decker also entered into an employment agreement with Gartner in 2022, which is governed by Connecticut law, and contains Connecticut forum and choice of law provisions.

## JURISDICTION AND VENUE

15.     Jurisdiction is proper in this district pursuant to 28 U.S.C. §§ 1331 and 1367 because Gartner asserts claims under the Federal Defend Trade Secrets Act. 18 U.S.C. § 1836, *et seq*.

16.     Venue is proper in this district under 28 U.S.C. § 1391(b)(3) because, pursuant to Faramo's and Van Decker's employment agreements with Gartner, the parties consented to the exclusive jurisdiction of the federal and state courts of Connecticut in the event of a breach or threatened breach of such agreement, and because Hackett has tortiously interfered with a contract governed by Connecticut law.

## GENERAL ALLEGATIONS

## Gartner's Business

17.     Gartner is a global research and advisory firm that provides clients with indispensable and enterprise-wide insights, advice and tools to help them achieve their mission critical priorities. Gartner delivers actionable, objective insight to executives and their teams. Gartner's expert guidance and tools enable faster, smarter decisions and stronger performance on an organization's mission critical priorities.

18.     Gartner's Research and Advisory business delivers independent, objective research, advice, and guidance to leaders across an enterprise through subscription services that include on-demand access to published research content. Gartner delivers its products and services globally through several distinct business segments.

19.     Gartner's Global Technology Sales ("GTS") organization sells products and services to users and providers of technology, while its Global Business Sales ("GBS") organization sells products and services to other functional leaders, such as those in human resources, supply chain, marketing, and finance.

20.     Among other things, Gartner publishes Magic Quadrants ("MQ"), a series of market research reports based on its proprietary qualitative data analysis, which demonstrate market trends for a variety of technology-based industries. A significant amount of the data analyzed in the MQs is gathered through Gartner's vendor briefings, where Gartner's analysts and advisors speak with various industry vendors in connection with preparing the MQs. The vendor briefings allow vendors an opportunity to educate Gartner about their businesses, including their place within the industry and their vision for the future of their companies.

21.     Within the Research and Advisory segment, there are myriad industry groups that specialize in distinct industries or market segments. These groups create must-have research,

market predictions, and best practices for C-level executives and their teams who operate within those industries and market segments.

22.    Gartner distinguishes itself from its competitors based on, among other things, its talented employees and delivery of high-quality products and services which it has developed through significant time and expense.

**Faramo's Employment with Gartner**

23.    Faramo began his employment with Gartner in 2004 as an Account Executive.  He worked his way through various leadership roles in Gartner's different sales channels, serving in the following titles over a nearly 20 year tenure: Strategic Account Executive; Manager, Sales Training and Development; Global Director, Sales Training and Development; Managing Director, Business Development; Regional Vice President, Sales – State and Local Government; and Managing Vice President, Sales.

24.    Throughout his career, Faramo worked in each of Gartner's various sales channels and understood the entirety of Gartner's sales platform.  For example, he worked both in Gartner's Midsize Enterprises ("MSE") and America's Large Enterprise ("ALE") channels, as well as Gartner's GTS and GBS organizations.  Each of these experiences informed Faramo's Gartner expertise that extended throughout his career.  For instance, in MSE, Faramo learned how to sell Gartner and showcase its offerings to smaller and medium sized businesses.  In ALE, Faramo parlayed his MSE experience and learned how to serve larger enterprises.  Armed with this multi-layered knowledge, Faramo spent almost two decades selling Gartner's products across its different verticals, training others on how to be successful sales executives by using Gartner's proprietary sales methodologies, and managing teams and countless customer relationships.

25.     Faramo had access to and a deep understanding of Gartner confidential and trade secret information, including its product and service offerings (past, present and future); client and prospect identities; client entitlements; pricing and structure of products and services; client engagement and purchasing information; and go-to-market strategies for various Gartner solutions.

26.     During his time at Gartner, Faramo also served as a trainer, manager, and director in Gartner's Sales Learning & Development organization.   Faramo trained Gartner's sales professionals across the world on Gartner's proprietary and confidential sales methodologies, and how to achieve a successful sales career at Gartner.  To serve in this role, Faramo needed not only to demonstrate personal excellence in Gartner's sales organization and a mastering of Gartner's sales methodologies, but possess an intimate understanding of Gartner's sales methodology.

27.     Gartner's sales strategy and methodology is proprietary, methodical, and unique to Gartner.  Gartner has spent years investing in its Sales Learning & Development organization to improve, evolve, and refine Gartner's sales strategy.  This proprietary methodology is Gartner's secret to success and critical to its competitive edge in the marketplace. Faramo's most recent and prior roles with Gartner provided him with crucial access and insight into Gartner's research methods, sales tools and insights, pricing, and sales strategies, in addition to Gartner's broader research processes, methodologies, analyses and strategies.

28.     Faramo also worked closely with both Gartner's Account Executives ("AEs") and Business Developers ("BDs") throughout his tenure.  Gartner's AEs are primarily responsible for fostering and growing existing client relationships, whereas BDs are the "hunters" who bring in new business to Gartner.  Through his roles and based on his tenure with Gartner, Faramo was intimately familiar with Gartner's "playbook" for various sales strategies for both AEs and BDs.

29.     These strategies represent some of the prime sources of Gartner's long-term success in obtaining new business and keeping and growing that business over time.

30.     Most recently, Faramo's role was primarily focused on selling Gartner's products and services to Chief Marketing Officers and Chief Financial Officers in the GBS channel.  Prior to this, Faramo spent years working in Gartner's largest sales channel, GTS, working with Chief Information Officers and other IT-leaders.  Faramo held this role from to January 2016 to January 2018.

31.     At the time of his resignation, Faramo was Gartner's Managing Vice President for the North American Marketers Team.  Faramo took this role in January 2018.

32.     In this role, Faramo managed teams of sales leaders and executives with an eye toward growing Gartner's strategic client relationships and building revenue.

33.      Gartner promoted Faramo to his role as Managing Vice President within GBS to help Gartner blend a team of sales professionals from three different entities acquired by Gartner, in addition to legacy Gartner employees.  More specifically, on the AE side, Faramo played a key role in helping tear down walls and remove silos of the various segments of Gartner's business after these acquisitions to build a stronger and unified team.  Given Faramo's intimate and in-depth experience with Gartner's entire sales organization, he was tasked with integrating the various teams under a singular Gartner umbrella.

34.     As part of the ongoing effort to integrate these companies into one, Faramo was part of discussions at the leadership level regarding product strategy, forecasting for new products, new product launches, and what products to retire.  Faramo's participation in these discussions exposed him to information regarding not only what products Gartner was retiring and why, but exactly what customers wanted to see Gartner developing.  Faramo was exposed to detailed

customer feedback regarding Gartner's products and the related strategy for product-related decisions.

35.    At the time he resigned, Faramo was working on a project to identify and organize certain verticals within the Marketing sales practice to optimize Gartner's products and services to best address customer needs.  This required Faramo to know and understand the identities of Gartner's customers in this space and to leverage his own experience and Gartner's industry-focused research to meet those customers' needs.

36.    In his most recent role and during his time in GTS, Faramo also had access to Gartner's "Org Base" platform which stores information related to each customer's relationship with Gartner, including customer spend, the Gartner employees attached to the customer's account, and other customer-specific information.  Information about prospective customers was also available to Faramo in Gartner's Org Base system.

37.    Faramo also had regular access to pipeline data across the GBS Marketing practice. This included detailed information regarding BDs' target opportunities, the anticipated size of the potential deal, the prospect's current stage in the pipeline, the composition of the potential deal (e.g., standard product offerings versus premium product offerings), and other details Gartner curated from its research and prospect interfacing to ultimately close the deal.  Additionally, Faramo was privy to forecast data for his peers across Gartner's U.S. marketing practice, which identified the amounts Gartner business team members anticipated selling.

38.    This information also allowed Faramo to continually assess market trends, including what customers were demanding, what is on the horizon, and where the market is headed. Faramo also received monthly reports from Gartner's Analysts which outlined customers' top

inquiries, interests, and the most read pieces of Gartner research, further allowing him to stay ahead of the competition.

39.     To fulfill these various roles, Faramo also had a deep understanding of Gartner's offerings (past, present and future), the identities of Gartner's customers and prospects, customer and prospect priorities, pricing and structure of products and services, go-to-market strategies for various Gartner solutions, and how to best position the appropriate Gartner solutions against any competitive offerings.

40.     Faramo understood and implemented Gartner's strategies for driving clients and prospects toward key issues and topics where Gartner could provide the most value and support, strengthening Gartner's relationships with those clients, securing prospects, and maintaining long-term relationships.  Faramo also understood how Gartner drove demand for its products and offerings to increase its market share and obtain new clients in various segments.  Faramo knows how to leverage Gartner's expertise and do the exact same thing for a competitor in the same space.

41.     Faramo also had access to Gartner documents and information detailing these strategies and Gartner's overall sales methodology.

42.     Faramo expressly acknowledged the confidential and proprietary nature of the information to which Gartner provided him access throughout his employment in various Agreements Regarding Certain Conditions of Employment, as set forth herein. Gartner required Faramo to attend and successfully complete Gartner's Data Protection Training. This training outlines Gartner employees' data protection responsibilities and underscores the importance of protecting and safeguarding Gartner's confidential information.

**Faramo's Agreement Regarding Certain Conditions of Employment**

43. Because Gartner highly values its products, services, strategies, processes, tools, and insights, and because Gartner provided Faramo with access to such information, Faramo entered into an Agreement Regarding Certain Conditions of Employment (the "Faramo Agreement") to protect Gartner's trade secrets, proprietary and confidential information, and customer and employee relationships.

44. Faramo signed the Faramo Agreement on March 4, 2022 in connection with the grant of Restricted Stock Units ("RSUs"), which Gartner only provides to its highest performing leaders. *See* Faramo Agreement attached hereto as **Exhibit A**.

45. The Faramo Agreement contains, among other things, reasonable and limited post-employment confidentiality and non-disclosure, non-competition, and non-solicitation provisions.

46. The confidentiality and non-disclosure provisions of the Faramo Agreement prohibit Faramo from using or disclosing Gartner's or its clients' Confidential Information (as defined below).

47. More specifically, the Faramo Agreement forbids Faramo from using or disclosing Gartner's or its clients' Confidential Information other than solely in the furtherance of Gartner's business and further prohibits Faramo from taking any actions which would constitute or facilitate the unauthorized use or disclosure of Confidential Information. *See* Ex. A, ¶ (1)(b)(i)-(iv).

48. The Faramo Agreement defines "Confidential Information" in Section 1(a) as:

> (i) financial information, (ii) products, (iii) product and services costs, prices, profits and sales, (iv) forecasts, (v) computer programs, (vi) databases (and the documentation and information contained therein), (vii) computer access codes and similar information, (viii) software ideas, (ix) know-how, technologies, concepts and designs, (x) research projects and all information connected with research and development efforts, (xi) records, (xii) business relationships, methods and recommendations, (xiii) client lists (including identities of clients and prospective clients, identities of individual contracts at business entities which are clients or prospective clients, client spending, preferences, business or habits), (xiv) subscription or consultant termination dates, (xv) personnel

files, (xvi) competitive analyses, and (xvii) other confidential or proprietary information that has not been made available to the general public by the Company's senior management, and (xviii) non-public information provided to the Company by its clients. Employee further acknowledges that all information related to the operation of the Company's business, including, without limitation, knowledge of the Company's assets referenced above and other tangible or intangible assets and other information obtained by Employee in the course of employment (collectively, the "Company's Property"), (i) are confidential and trade secrets of the Company (collectively, the "Confidential Information"), (ii) shall remain the property and trade secrets of the Company, and (iii) may be subject to trademark, trade dress, copyright or similar protections.

49.    The Faramo Agreement's non-competition provision provides, in pertinent part:

**6.    Non-Competition.**

…

(b) Non-Competition.

Employee agrees that, for a period of one (1) year following the termination of his or her Employment with the Company, for any reason whatsoever, Employee will not, on his or her own behalf or on behalf of any other person or entity (whether as a consultant, analyst, sales person, independent contractor, independent business venturer, partner, member, employee or otherwise), directly or indirectly:

(i) Engage in any Competitive Acts; and/or

(ii) Entice, encourage, cause or invite any of the Company's clients, prospects, or vendors to discontinue or diminish their business with the Company, or otherwise interfere with or adversely modify their relationships with the Company. Paragraph 6(b)(ii) is limited to clients, prospects, or vendors with whom Employee had contact, managed, or became aware of at any time during the Employment.

Ex. A, ¶ 6(b).

50.    The Faramo Agreement defines "Competitive Acts" as follows:

6(a)(i) . . . Competitive Acts shall mean: (A) the development, production, marketing or selling of (or assisting others to develop, produce, market or sell): (x) syndicated research that competes with Gartner or its subsidiaries; or (y) a product or service which is competitive with the existing or planned products or services of the Company with which Employee was involved in or managed

at any time during the last twenty-four (24) months of the Employment; and/or (B) the direct or indirect provision of services to, or solicitation of, the Company's clients or known prospects with whom Employee had contact, managed, or became aware of as a result of being employed by the Company, for the purposes of developing, producing, marketing or selling such competitive products or services.

Ex. A, ¶ 6(a)(i).

51.    The Faramo Agreement's employee non-solicitation provision provides, in pertinent part:

(c) Non-Solicitation.  Employee further agrees that, for a period of eighteen (18) months following the termination of his or her Employment with the Company, for any reason whatsoever, Employee will not, directly or indirectly solicit, entice, or recruit employees of the Company to leave its employ, or offer or cause to be offered employment to any person who was employed by the Company at any time during the twelve (12) months prior to the termination of Employee's employment with the Company.

Ex. A, ¶ 6(c).

52.    By signing the Faramo Agreement, Faramo agreed, among other things, that all information related to the operation of Gartner's business, including, without limitation, knowledge of Gartner's assets and other information he obtained in the course of his employment are confidential and trade secrets of Gartner and shall remain the property and trade secrets of Gartner.  Faramo further acknowledged any disclosure of the Gartner's Confidential Information would cause irreparable and material damage to Gartner.  *See* Ex. A, ¶ 9.

53.    Faramo also agreed if he violated the Faramo Agreement's terms, Gartner would be entitled to, among other things, immediate injunctive relief.  *See* Ex. A, ¶ 9(a).  Faramo further agreed to the Faramo Agreement's tolling provision, providing "the limitation periods for the restrictions contained herein shall be tolled for the length of time during any period in which any of the restrictions are violated."  *See* Ex. A, ¶ 6(f).

54.    The Faramo Agreement is governed by Connecticut law.  *See* Ex. A., ¶ 15.  Faramo also consented to jurisdiction of any disputes arising in the event of a breach of Sections 1, 2, 4, 5, or 6 of the Faramo Agreement in a state or federal court in Connecticut and agreed not to contest such jurisdiction or venue.  *See* Ex. A, ¶ 16.

55.    The Faramo Agreement provides for attorneys' fees as follows:

> If any party to this Agreement breaches any terms of this Agreement, then that party shall pay to the non-defaulting party all of the non-defaulting party's costs and expenses, including attorneys' fees, incurred by that party in enforcing the terms of this Agreement.

Ex. A, ¶ 18.

56.    The Faramo Agreement also contains a Liquidated Damages provision, which entitles Gartner to liquidated damages in the event of a violation of Section 6 of the Faramo Agreement, including a violation of the non-competition or non-solicitation provisions.  The Faramo Agreement provides, in pertinent part:

> Employee agrees that, in addition to any and all other remedies available to the Company (at law, in equity, or as otherwise set forth in this Agreement), the Company shall be entitled to liquidated damages for any violation of Section 6 of this Agreement in an amount equal to: (i) the final twelve (12) months' salary, commissions, and bonus paid to Employee; and (ii) for any Employee who received stock pursuant to an RSU, PSU and/or SAR agreement or plan with the Company, an additional amount equal to the aggregate dollar value of shares underlying any stock appreciation rights, performance stock units, and/or restricted stock units that vested (or, in the case of stock appreciation rights, vested and Employee exercised) at any time during the twelve (12) months prior to separating from the Company. The dollar value of each such share shall be equal to the closing price of Gartner stock on the date of grant of the applicable stock appreciation right, performance stock unit or restricted stock unit. Employee agrees that the liquidated damages set forth herein are a reasonable estimate of the damages experienced by the Company for a violation of Section 6 of this Agreement, and are not to be deemed a penalty of any kind.

Ex. A, ¶ 6(d).

**Van Decker's Employment with Gartner**

57.     Van Decker was a long-tenured Vice President, Analyst for Gartner.  Van Decker started with Gartner as a Vice President, Analyst in 2008.

58.     In this role, Van Decker served as a contributor and thought leader within Gartner's Research and Advisory organization, providing expert guidance and assistance to various leaders throughout his tenure to enable faster, smarter decisions and stronger performance on a client organization's most critical priorities.

59.     Van Decker primarily worked in Gartner's Finance Technology ("Finance Tech") and Enterprise Resource Planning Solutions ("ERP") segments within the Research and Advisory organization.

60.     Gartner's Finance Tech and ERP segments focus on the applications and services companies use to manage their finances, including, among other things:  (i) ERP systems; (ii) financial close applications; and (iii) financial planning applications and services.

61.     Van Decker gained expertise in these segments by:  utilizing Gartner's Secondary Research Services to identify vendors in each market; arranging and attending vendor briefings with selected vendors in each market; and gathering knowledge from his direct peers and those who reported to him, including colleagues in Gartner Consulting and other Gartner business units who know these markets on a deeper level.

62.     Based on his tenure and expertise in these segments, Van Decker anchored Gartner's coverage of these markets.  Van Decker had a deep understanding of the markets, the businesses operating within them, the priorities and needs of these businesses, and how to establish the kind of meaningful and trusting relationships with these businesses that resulted in demand for Gartner products and services.

63.     Van Decker, through his employment with Gartner, developed well-established and strong vendor relationships with the various vendors in this space given his dealings with them year after year.

64.     Gartner regularly publishes MQs and Market Guides in Finance Tech and ERP. Van Decker not only had access to Gartner's proprietary research and MQs, but materially contributed to these publications in his role as a Vice President, Analyst over the many years he served with Gartner.

65.     Throughout his employment, Van Decker also gained intimate knowledge of Gartner's clients by conducting, developing, and reviewing research via client, vendor and analyst networking, as well as evaluating and analyzing information and participating in research meetings and other activities.  This analysis and interfacing provided Van Decker with a keen understanding of clients' vendor experiences and, in turn, the clients' expectations and needs and ultimately enabled Van Decker to tap into Gartner's specialized consumer base.

66.     Van Decker also worked as a Vice President, Analyst in Gartner's Technology & Service Providers ("TSP") segment for approximately five months before his resignation.

67.     Gartner's TSP segment and its analysts provide must-have research and advice to help technology and communications leaders better understand and grow their businesses. Gartner's TSP segment offers targeted research and advice for General Managers, Product Managers, Product Marketers, and Emerging Tech CEOs, among others.  Analysts in this segment help these leaders with go-to-market strategies, competitive positioning, marketing priorities and investments, and market strategy evaluation, among other critical issues.

68.     Van Decker expanded his knowledge of Gartner's clients, relationships with clients and vendors, and Gartner's targeted research in this segment in this role. For this reason, Gartner

required Van Decker to attend and successfully complete Gartner's Data Protection Training. This training outlines Gartner employees' data protection responsibilities and underscores the importance of protecting and safeguarding Gartner's confidential information.

**Van Decker's Agreement Regarding Certain Conditions of Employment**

69.     Because Gartner highly values its products, services, strategies, processes, tools, and insights, and because Gartner also provided Van Decker with access to such information, Van Decker also entered into an Agreement Regarding Certain Conditions of Employment (the "Van Decker Agreement," together with the Faramo Agreement, the "Agreements") to protect Gartner's trade secrets, proprietary and confidential information, and customer and employee relationships.

70.     Van Decker signed the Van Decker Agreement on March 4, 2022, in connection with his transfer to TSP, which came with a pay raise and increased bonus.[1]  *See* Van Decker Agreement attached as **Exhibit B**.

71.     The confidentiality and non-disclosure provisions of the Van Decker Agreement prohibit Van Decker from using or disclosing Gartner's or its clients' Confidential Information (as defined below).

72.     Like the Faramo Agreement, the Van Decker Agreement forbids Van Decker from using or disclosing Gartner's or its clients' Confidential Information other than solely in the furtherance of Gartner's business and further prohibits Van Decker from taking any actions which would constitute or facilitate the unauthorized use or disclosure of Confidential Information. *See* Ex. B, ¶ (1)(b)(i)-(iv).

73.     The Van Decker Agreement defines "Confidential Information" in Section 1(a) as:

(i) financial information, (ii) products, (iii) product and services costs, prices, profits and sales, (iv) forecasts, (v) computer programs, (vi) databases (and the documentation and

---

[1] On March 15, 2019 in connection with the grant of RSUs, Van Decker executed an Agreement Regarding Certain Conditions of Employment. The March 15, 2019 agreement is substantially similar to the March 4, 2022 Agreement.

information contained therein), (vii) computer access codes and similar information, (viii) software ideas, (ix) know-how, technologies, concepts and designs, (x) research projects and all information connected with research and development efforts, (xi) records, (xii) business relationships, methods and recommendations, (xiii) client lists (including identities of clients and prospective clients, identities of individual contracts at business entities which are clients or prospective clients, client spending, preferences, business or habits), (xiv) subscription or consultant termination dates, (xv) personnel files, (xvi) competitive analyses, and (xvii) other confidential or proprietary information that has not been made available to the general public by the Company's senior management, and (xviii) non-public information provided to the Company by its clients. Employee further acknowledges that all information related to the operation of the Company's business, including, without limitation, knowledge of the Company's assets referenced above and other tangible or intangible assets and other information obtained by Employee in the course of employment (collectively, the "Company's Property"), (i) are confidential and trade secrets of the Company (collectively, the "Confidential Information"), (ii) shall remain the property and trade secrets of the Company, and (iii) may be subject to trademark, trade dress, copyright or similar protections.

Ex. B, ¶ 1(a).

74.    The Van Decker Agreement's non-competition provision provides, in pertinent part:

**6.    Non-Competition.**

…

(b) Non-Competition.

Employee agrees that, for a period of one (1) year following the termination of his or her Employment with the Company, for any reason whatsoever, Employee will not, on his or her own behalf or on behalf of any other person or entity (whether as a consultant, analyst, sales person, independent contractor, independent business venturer, partner, member, employee or otherwise), directly or indirectly:

(i) Engage in any Competitive Acts; and/or

(ii) Entice, encourage, cause or invite any of the Company's clients, prospects, or vendors to discontinue or diminish their business with the Company, or otherwise interfere with or adversely modify their relationships with the Company.

75.    The Van Decker Agreement defines "Competitive Acts" as follows:

> 6(a)(i) . . . Competitive Acts shall mean: (A) the development, production, marketing or selling of (or assisting others to develop, produce, market or sell): (x) syndicated research that competes with Gartner or its subsidiaries; or (y) a product or service which is competitive with the existing or planned products or services of the Company with which Employee was involved in or managed at any time during the last twenty-four (24) months of the Employment; and (B) the direct or indirect provision of services to, or solicitation of, the Company's clients or known prospects with whom Employee had contact, managed, or became aware of as a result of being employed by the Company, for the purposes of developing, producing, marketing or selling such competitive products or services.

Ex. B, ¶ 6(a)(i).

76.    The Van Decker Agreement's employee non-solicitation provision provides, in pertinent part:

> (c) Non-Solicitation.  Employee further agrees that, for a period of eighteen (18) months following the termination of his or her Employment with the Company, for any reason whatsoever, Employee will not, directly or indirectly solicit, entice, or recruit employees of the Company to leave its employ, or offer or cause to be offered employment to any person who was employed by the Company at any time during the twelve (12) months prior to the termination of Employee's employment with the Company.

Ex. B, ¶ 6(c).

77.    By signing the Van Decker Agreement, Van Decker agreed, among other things, that all information related to the operation of Gartner's business, including, without limitation, knowledge of Gartner's assets and other information he obtained in the course of his employment are confidential and trade secrets of Gartner and shall remain the property and trade secrets of Gartner.  Van Decker further acknowledged any disclosure of the Gartner's Confidential Information would cause irreparable and material damage to Gartner.  *See* Ex. B, ¶ 9.

78.    Van Decker also agreed if he violated the Van Decker Agreement's terms, Gartner would be entitled to, among other things, immediate injunctive relief.  *See* Ex. B, ¶ 9(a).  Van Decker further agreed to the Van Decker Agreement's tolling provision, providing "the limitation

periods for the restrictions contained herein shall be tolled for the length of time during any period in which any of the restrictions are violated." *See* Ex. B, ¶ 6(f).

79. The Van Decker Agreement is governed by Connecticut law. *See* Ex. B, ¶ 15. Van Decker also consented to jurisdiction of any disputes arising in the event of a breach of Sections 1, 2, 4, 5, or 6 of the Van Decker Agreement in a state or federal court in Connecticut and agreed not to contest such jurisdiction or venue. *See* Ex. B, ¶ 16.

80. The Van Decker Agreement provides for attorneys' fees as follows:

> If any party to this Agreement breaches any terms of this Agreement, then that party shall pay to the non-defaulting party all of the non-defaulting party's costs and expenses, including attorneys' fees, incurred by that party in enforcing the terms of this Agreement.

Ex. B, ¶ 18.

81. The Van Decker Agreement also contains a Liquidated Damages provision, which entitles Gartner to liquidated damages in the event of a violation of Section 6 of the Van Decker Agreement, including a violation of the non-competition or non-solicitation provision. The Van Decker Agreement provides, in pertinent part:

> Employee agrees that, in addition to any and all other remedies available to the Company (at law, in equity, or as otherwise set forth in this Agreement), the Company shall be entitled to liquidated damages for any violation of Section 6 of this Agreement in an amount equal to: (i) the final twelve (12) months' salary, commissions, and bonus paid to Employee; and (ii) for any Employee who received stock pursuant to an RSU, PSU and/or SAR agreement or plan with the Company, an additional amount equal to the aggregate dollar value of shares underlying any stock appreciation rights, performance stock units, and/or restricted stock units that vested (or, in the case of stock appreciation rights, vested and Employee exercised) at any time during the twelve (12) months prior to separating from the Company. The dollar value of each such share shall be equal to the closing price of Gartner stock on the date of grant of the applicable stock appreciation right, performance stock unit or restricted stock unit. Employee agrees that the liquidated damages set forth herein are a reasonable estimate of the damages experienced by the Company for a violation of Section 6 of this Agreement, and are not to be deemed a penalty of any kind.

Ex. B, ¶ 6(d).

**Gartner Protects Its Confidential Information**

82.     Gartner protected the confidential and proprietary information and trade secrets to which Faramo and Van Decker had access by, among other things, requiring them to attend trainings and to affirm compliance with Gartner's Code of Conduct and other core policies, like Gartner's Data Protection Policy.  In reliance on Van Decker's and Faramo's affirmations and long-tenure with the company, Gartner provided Faramo and Van Decker access to highly sensitive content that is unavailable to other Gartner employees.

83.     Additionally, Gartner requires employees with access to its confidential and proprietary information and its trade secrets to execute agreements substantially similar to the Agreements.

84.     Gartner also required Faramo to attend and complete GBS Ethical Selling Training Module and Affirmation as part of his GBS role and its provision of confidential information and trade secrets.

**Hackett's Business and Its New "Transformative Business Plan"**

85.     Hackett is an intellectual property-based executive advisory, IP as-a-Service Revenue ("IPaaS"), market intelligence, digital transformation consultancy firm serving global companies.  Similar to Gartner on many levels, Hackett offers services including benchmarking, executive advisory, IPaaS, market intelligence, business transformation and cloud enterprise application implementation.

86.     Hackett is incorporated in the State of Florida and conducts business throughout the United States, including Connecticut.

87.     Hackett's newly publicized "Transformative Business Plan" focuses on "Recurring Revenue, and Relationship Expansion," due to "executive research programs, market intelligence programs, and syndicate intellectual property."  Hackett is intentionally and actively expanding its syndicated research offerings, and it is now competing with Gartner and trying to steal Gartner's market share.[2]

88.     Hackett is focused on this "organic growth opportunity with foundation of high-margin recurring revenue."[3]

89.     Per its 2022 Annual Report, Hackett has changed "the way [it] go[es] to market and engage[s] clients, as well as added software implementation and market intelligence offerings and partners" as part of "reposition[ing] [its] offerings to the emerging digital transformation opportunities."[4]

90.     Hackett has a "Market Intelligence" segment where its "independent research on software and service providers supplies executives with intelligence that quantifies business value to make better informed purchasing decisions."[5]

91.     Just this year, Hackett launched its "Hackett Connect" platform, which supports its executive and market intelligence offerings, including its syndicated research channel relationships.  Hackett Connect manages Hackett's "leading market intelligence research programs for executives and software and services providers."[6]

92.     Gartner, too, markets itself as "deliver[ing] actionable, objective insight to executives and their teams" and providing "[t]ools to make smarter, faster decisions."[7]

---

[2] Image Relay - Welcome to The Hackett Group digital library |, attached as **Exhibit G**.
[3] *Id.*
[4] Hackett 2022 Annual Report, pp. 4-5.
[5] *See* https://www.thehackettgroup.com/about/ (accessed on May 8, 2023)
[6] *See* https://www.thehackettgroup.com/about/ (accessed on May 8, 2023)
[7] https://www.gartner.com (accessed May 5, 2023)

93.    As part of its "transformative business plan," Hackett also "expanded executive research and advisory and market intelligence programs and dedicated sales expertise to grow high margin annualized recurring revenues."  Hackett claims "these relationships are also currently responsible for over 40% of the downstream Hackett's business transformation and technology consulting services."[8]

94.    This investment in its syndicated research development and market intelligence offerings is a primary focus for Hackett in 2023.  In its February 21, 2023 Q4 2022 Earnings Call, Hackett's CFO, Robert Ramirez stated: "[T]the first quarter of 2023 will reflect the incremental investment we are making in program development and add the dedicated sales resources for benchmarking, IPaaS, Executive Advisory Market Intelligence and our other IP service offerings."[9]

95.    In light of Hackett's new strategic direction and focus on syndicated research and market intelligence offerings, it has been targeting Gartner employees, like Faramo, Van Decker, and others, to join Hackett in order to unfairly capitalize on the specialized training and unique knowledge Gartner provides its employees.

96.    In its February 21, 2023 Q4 2022 Earnings Call, Hackett's CEO, Ted Fernandez, stated: "We have also added new content and IP to our existing functionally focused executive advisory programs, improvements in our existing programs, along with new market intelligence programs, the launch of our new member, Hackett Connect, along with our aggressive sales hiring should allow us to continue to grow our higher-margin recurring revenues and related annual contract value during 2023."[10]

---

[8] Hackett 2022 Annual Report, p. 4.
[9] *See* Hackett Group, Inc. FQ4 2022 Earnings Call Transcript, attached as **Exhibit H**, p. 6.
[10] *See id.*, p. 5.

97.    Mr. Fernandez added further context regarding Hackett's "aggressive sales hiring": "[T]he prospects for us to continue to grow our Research Advisory IPaaS offerings and new market intelligence programs is significant. We think that the biggest thing that we lack is a world-class sales group. We're adding both senior and entry and mid-level people to our team. We'll continue to do that throughout the year."[11]

98.    In line with this "aggressive sales hiring," a Hackett recruiter reached out to a high-level Gartner Sales Leader, who is still employed by Gartner, seeking a "Market Intelligence Sales Leader/Partner" with "Magic Quadrant" experience selling to "vendor executives" who would be "responsible for developing a sales team to support a 'start-up practice' focused on selling high value membership to solution providers."

99.    Further, the recruiter stated that Hackett's CEO "created" the role "due to [Hackett's] capabilities and growth in this area."  Finally, the recruiter represented that "the business plan for the Market Intelligence practice is to develop a dedicated team that [Hackett] believe[s] will be an industry paradigm-changing solution provider comparison analytical tool."

100.    In other words, Hackett was looking for a sales leader to develop a team to do exactly what Gartner does.  Hackett reached out to multiple Gartner leaders to fill this role, ultimately landing on Faramo.

101.    Hackett has hired at least seven former Gartner employees in the last six months. A significant number of Gartner employees poached by Hackett are BDs.  Hackett is arming itself with Gartner's "bench" of business developers in order to reposition itself in the market and push its syndicated research and market intelligence offerings.

---

[11] *See id.*, p. 11.

102.    Hackett is capitalizing upon Gartner's premier industry ranking – specifically by poaching Gartner's employees, like Faramo and Van Decker –  to increase its visibility in the industry.

103.    Gartner has already felt the harm of Hackett's new go-to-market strategy and intense focus on syndicated research and market intelligence, specifically in Gartner's Europe, Middle East and Africa ("EMEA") markets in the Finance segment.  Indeed, Gartner lost at least two Research and Advisory prospects to Hackett this year already in its EMEA market.

104.    With Hackett's focus on its "aggressive sales hiring," as evidenced by hiring BDs and Faramo, Hackett is arming itself to unfairly steal Gartner's market share on a truly global level. With Van Decker's expertise, deep knowledge of Gartner's products and offerings, and vendor relationships, Hackett is primed to unfairly compete with Gartner. Faramo's multi-faceted expertise in the MSE, ALE, AE and BD segments further enables Hackett to exploit Gartner's GTS and GBS segments and its client relationships, all developed at Gartner's considerable time and expense.

**Faramo's Pre-Resignation Misconduct and Employment with Hackett**

105.    On February 22, 2023, Hackett sent Faramo an offer letter to his Gartner email address.  Hackett offered Faramo a high six-figure salary, incentive compensation opportunities, and equity awards.   Hackett also informed Faramo his "experience and capabilities will complement and add depth" to Hackett.

106.    Faramo tendered his resignation to Gartner on March 6, 2023, and his last day of employment was March 17, 2023.

107.    Faramo refused to disclose the identity of his new employer to Gartner upon his resignation. Faramo also refused to engage with Gartner's Legal Team regarding his future employment, despite telling Gartner's Human Resources team he would do so.

108.    In the month leading up to his last day of employment, including after Faramo received his Hackett offer letter, Faramo sent a number of internal Gartner documents containing proprietary, confidential, and trade secret information to his personal email address.  These documents included the following information:

   a.  a grid outlining Gartner's competencies used to measure sales success, which can be used to build an identical framework for a competitor;

   b.  detailed information regarding Gartner's sales training programs, many of which are marked "RESTRICTED DISTRIBUTION";

   c.  charts documenting Gartner's "levers to increase growth" and internal commentary regarding Gartner growth metrics;

   d.  Gartner's internal research regarding Chief Sales Officer success;

   e.  Gartner intellectual property (including slide decks and talking points) created for customers who subscribe to Gartner's Chief Sales Officer Research and Advisory services, which are explicitly marked "RESTRICTED DISTRIBUTION" and "NOT FOR EXTERNAL DISTRIBUTION"; and

   f.  Gartner intellectual property (including slide decks and notes) documenting Gartner's proprietary process and methodology to drive clients and prospects toward certain topics and issues where Gartner can add the most value and support and increase demand for its products and services, which are explicitly marked "RESTRICTED DISTRIBUTION."

109.    Faramo had no reason to send these documents to his personal email address in the course of his day-to-day duties, especially when he was planning on resigning and joining a direct competitor.

110.    Faramo has not returned any of these documents to Gartner.

111.    Faramo sent the information set forth above in sub-paragraph 108(c) to his personal email address after he provided his resignation notice to Gartner.  Others were sent after Faramo received his Hackett Offer Letter.

112.    These documents constitute "Confidential Information" as defined by the Faramo Agreement, even those not marked as "restricted."

113.    The information Faramo sent to his personal email address can be used to build similar or identical processes and methodologies at Hackett to unfairly compete with Gartner.

114.    Hackett hired Faramo as its Senior Vice President, Global IPB sales.

115.    In this role, Faramo inevitably will draw from his nearly 20-years of Gartner experience. In particular, Faramo will utilize his experience in nearly all aspects of Gartner's sales divisions to target the same clients for whom Gartner competes for customer spend and about whom Faramo has specialized knowledge from both the AE and BD perspectives.

116.    Faramo has and will help Hackett implement its new "go to market strategies" and "transformative business plan."   Faramo has exactly the type of "sales expertise" Hackett is focused on brining to its company.

**Van Decker's Employment With Hackett**

117.    Van Decker resigned from Gartner in July 2022.  He joined Hackett as its Chief of Research in February 2023.

118.    Van Decker is leading Hackett's initiative to aggressively grow its market intelligence and syndicated research business, exactly what he did for Gartner as a long-tenured and high-level VP, Analyst.  Van Decker has a deep understanding of what clients in various business sectors are looking for in terms of market intelligence and subscription-based research, and has deep relationships with clients and vendors that he can translate to Hackett.

119.    In its publications, Hackett boasts that Van Decker "sets the vision for the research program at the Hackett Group," and touts that in his career as "a leading ERP and financial management IT industry analyst," he "has worked with thousands of customers concerning their IT and business strategies."[12]

120.    Van Decker has already hosted a podcast on behalf of Hackett specifically focused on research resulting from "Enterprise Key Issues" facing executive management in finance, HR, information technology, procurement, supply chain and global business services, as well as their "strategic priorities for 2023."[13]  This is precisely the kind of expertise Van Decker acquired solely by virtue of his longstanding Gartner tenure.

121.    Hackett is capitalizing on Van Decker's Gartner experience to gain more clients and exposure to implement its go-forward business plan.

122.    It will be impossible for Van Decker to perform in his role for Hackett without using the information he learned and relationships he built during his years at Gartner.

**Gartner's Post-Employment Letters to Faramo and Van Decker**

123.    On April 6, 2023, Gartner, through its counsel, sent Faramo and Van Decker separate letters regarding their post-employment contractual obligations to Gartner, attaching their respective Agreements to their separate letters.  *See* Letter to Faramo, **Exhibit C**; Letter to Van Decker, **Exhibit D**.

124.    The letters to Faramo and Van Decker sought specific assurances related to their post-employment obligations to Gartner.  Gartner also asked for information regarding their new

---

[12] *See* https://pages.awscloud.com/rs/112-TZM-766/images/Hackett_Business-impact-of-cloud-adoption-for-industrial-manufacturers.pdf?sc_channel=cfm-blog&sc_campaign=maximizing-business-impact-of-cloud-adoption-for-industrial-manufacturers&sc_medium=cfm&sc_content=cfm-blog&sc_detail=link&sc_outcome=aw&sc_publisher=cfm-awareness&trk=maximizing-business-impact-of-cloud-adoption-for-industrial-manufacturers_cfm_blog_link (las accessed on May 18, 2023).
[13] *See* https://www.thehackettgroup.com/podcast/2023-enterprise-key-issues-research/ (last accessed on May 18, 2023).

roles with Hackett in order to understand whether their employment with Hackett breached the Agreements and/or put Gartner's confidential, proprietary, and trade secret information at risk. Gartner made an effort to assess Faramo's and Van Decker's new role with Hackett and obtain information regarding their duties and responsibilities.

125.    Gartner's counsel also sent a copy of these letters to Hackett, both of which included a copy of the Faramo and Van Decker Agreements.  *See* Letter to Hackett, **Exhibit E**.

126.    In response, counsel for Faramo, Van Decker, and Hackett refused to provide any information to Gartner or engage in any meaningful dialogue whatsoever.  *See* Response, attached as **Exhibit F**.

127.    Neither Hackett, Faramo, nor Van Decker provided Gartner with any requested assurances that their employment with Hackett was not competitive with their roles with Gartner, that Hackett had taken any steps to ensure protection of Gartner's confidential and trade secret information, or provide any assurances regarding their roles with Hackett.  *Id.*

128.    Instead, incredibly, Hackett accused Gartner of improperly attempting to obtain *Hackett's* trade secret information by virtue of these requests.  *Id.*

129.    Since then, Gartner, through its counsel, has engaged in several attempts to work with Hackett to address its concerns and avoid escalating the situation.  On April 26, 2023, after two attempted phone calls by Gartner's counsel, counsel for Gartner and Defendants had a telephone conference.  Gartner's counsel explained that Gartner was looking for high-level information regarding the Individual Defendants' duties and other assurances in an effort to better understand their roles and potentially avoid litigation.  Counsel for the Defendants indicated he would revisit the issue with his clients in an effort to de-escalate the situation.  On May 4, 2023, after receiving no response or any supplemental information or assurances, Gartner's counsel

contacted Defendants' counsel about the status of the requested information via email. Defendants' counsel responded that same day, refusing to provide any of the requested information or assurances. Defendants' delay and ultimate refusal to provide the requested information hindered Gartner's efforts to promptly remedy the matter, despite its best efforts.

130.    Because Hackett and Gartner perform the same services and compete for the same client base, especially with Hackett's aggressive new business plan to grow and expand its market intelligence and syndicated research business, it will be impossible for Faramo or Van Decker to perform their roles at Hackett without utilizing the proprietary information they learned about Gartner's clients, research, and strategies.

131.    Faramo and Van Decker will rely upon and inevitably use this same sensitive, confidential and proprietary information to disrupt Gartner's client relationships and unlawfully steal Gartner's customer base.

132.    Faramo also sent himself numerous proprietary and confidential documents on his way out the door, each of which provide insights into Gartner's most sensitive processes and methodologies.  Faramo can and no doubt will use this information to Hackett's benefit.  Indeed, there would be no other reason for him to have sent all of this information to his personal email account after receiving Hackett's very lucrative offer and tendering his resignation to Gartner.

133.    In employing Faramo and Van Decker, Hackett knew it was inducing a breach of their lawful contractual obligations to Gartner.

134.    Hackett has induced breaches of the Agreements for the purpose of harming Gartner, diminishing the value of its confidential information and trade secrets, and undermining its position in the industry.

135.    Defendants' actions will unfairly erode Gartner's competitive edge and allow them to enhance their competitive business offerings with the depth of knowledge and industry experience that only Gartner employees have.

136.    Faramo and Van Decker have direct knowledge of, among other things, Gartner strategic information concerning research and/or sales methodologies, playbooks and strategic opportunities. Both of their roles respectively focused on developing a deep understanding of the markets in which they specialized, the Gartner clients who operate within them, the priorities and needs of those businesses and how to establish the kind of meaningful and trusting relationships that enable these clients to make the best possible decisions on the toughest challenges they have to confront. Both Faramo and Van Decker have intimate knowledge of clients' priorities, preferences, and needs, as well as the products and services they have purchased from Gartner.

137.    Faramo further has intimate and detailed knowledge of Gartner's sales strategies and methodologies, which is entirely unique and proprietary to Gartner.

138.    Faramo's and Van Decker's roles at Hackett necessarily will require their reliance on and use of this proprietary information to develop Hackett's own competitive products, tools, and services and market them to Gartner's clients and prospective clients, all to Gartner's substantial detriment.  Hackett hired Faramo and Van Decker to launch its competing business segment, which is a primary focus of Hackett for 2023.

139.    This will allow Hackett to gain an unfair competitive advantage over Gartner and cause and further induce Faramo and Van Decker to unlawfully compete with Gartner.

140.    Gartner's business in this specialized space, including its relationships with its clients, employees, vendors, and other partners, remains at significant risk due to Faramo's and

Van Decker's continued violations of their contractual obligations to Gartner, and Hackett's inducement of their breaches.

141.    Defendants' actions have damaged, and will continue to damage, Gartner.

142.    In particular, Defendants' actions have diminished the value of Gartner's confidential and proprietary information, harmed Gartner's relationships with its customers and employees, and damaged Gartner's goodwill, reputation, and competitive advantage.

### COUNT I
**Breach of Contract – Non-Competition**
**(Injunctive Relief and Damages)**
**Against Faramo and Van Decker**

143.    Gartner realleges and incorporates by reference Paragraphs 1 through 142 as though fully set forth herein.

144.    Faramo entered into the Faramo Agreement with Gartner on March 4, 2022.

145.    Van Decker entered into the Van Decker Agreement with Gartner on March 4, 2022.

146.    Gartner provided Faramo and Van Decker with RSUs, continued employment, compensation increases, and access to and actual provision of confidential and proprietary information in exchange for executing their respective Agreements.

147.    Among other obligations under their respective Agreements, Faramo and Van Decker agreed and were obligated, for a period of one (1) year following the termination of their employment with Gartner, to refrain from engaging in any "Competitive Acts" (as defined within the Agreements).

148.    The Agreements generally define "Competitive Acts," in part, to include: (A) the development, production, marketing or selling of (or assisting others to develop, produce, market or sell): (x) syndicated research that competes with Gartner or its subsidiaries; or (y) a product or

service which is competitive with the existing or planned products or services of the Company with which Employee was involved in or managed at any time during the last twenty-four (24) months of the Employment; and/or (B) the direct or indirect provision of services to, or solicitation of, the Company's clients or known prospects with whom Employee had contact, managed, or became aware of as a result of being employed by the Company, for the purposes of developing, producing, marketing or selling such competitive products or services.

149.    The Agreements are valid and enforceable contracts.

150.    The Agreements protect Gartner's legitimate business interests, including its proprietary, confidential, and trade secret information, and its client and employee relationships.

151.    The Agreements' terms are reasonable in that the non-compete provisions are temporally limited to only one (1) year post-employment.  The geographic scope is also reasonable considering the global nature of Gartner's business and client base.  Further, the scope of activity as it relates to the non-competition provision is limited to those business which directly compete with Gartner and put Gartner's proprietary, confidential, and trade secret information directly at risk.  Faramo and Van Decker are not restrained from pursuing their occupations.

152.    These terms are fair and reasonable in order to protect Gartner's legitimate business interests.

153.    The Agreements do not harm or interfere with the public interest.

154.    The terms of the Agreements do not pose an undue hardship on Faramo or Van Decker.

155.    Gartner has fully performed its contractual obligations to Faramo and Van Decker under the Agreements.

156.    The terms of the Agreements are not greater than required for the protection of Gartner's legitimate business interests, including its confidential information and good will with its customers.

157.    Hackett is a direct competitor of Gartner.  Hackett has repeatedly expressed it is aggressively expanding and growing its market intelligence and syndicated research business, which directly competes with Gartner.  Hackett is looking to provide market intelligence and research to the same senior leaders in various C-Suite and other roles across many industries, just like Gartner, with two former Gartner leaders at the helm.  Hackett continues to identify this business as its primary initiative for 2023.

158.    Gartner's business includes providing clients, including senior leaders and their teams within IT, finance, marketing, sales and customer service, legal, compliance and assurance, among others, with enterprise-wide insights, advice, and tools to help them achieve their mission critical priorities.  Gartner's guidance and advice includes competitive analysis reports, industry overviews, market trend data, research notes, and product evaluation reports, and Gartner provides its clients with access to its world class teams of analysts and advisors, as well as technology management, technology selection, consulting, and conference services.

159.    At Hackett, Faramo and Van Decker are working in substantively the same roles they held at Gartner and are violating their Agreements with Gartner.

160.    Faramo is serving as Hackett's Senior Vice President of Global Sales.

161.    Van Decker is serving as Hackett's Chief of Research.

162.    Faramo and Van Decker violated the Agreements by virtue of accepting employment with Hackett, a direct Gartner competitor, to research, develop, produce, market or sell products or services that are competitive with the services they provided while at Gartner.

163.    Gartner has suffered and will continue to suffer damages as a result of Faramo's and Van Decker's breach of contract, including diminished value of its confidential information, damaged goodwill with customers, and loss of its competitive advantage.

164.    Gartner's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory relief.

165.    Faramo's and Van Decker's actions will continue to harm Gartner if not enjoined.

166.    Should the Court grant injunctive relief to Gartner, the burden on Faramo and Van Decker would be slight compared to the injury to Gartner if injunctive relief is not granted.

167.    Further, Faramo and Van Decker agreed injunctive relief would be an appropriate remedy in the event they breached the Agreements.

168.    Granting an injunction will not disserve the public interest.  Indeed, injunctive relief is consistent with the Agreements between the parties.

**WHEREFORE**, Gartner prays for judgment against Faramo and Van Decker and requests the Court grant the following relief:

A.  entry of a Preliminary Injunction and Permanent Injunction against Faramo and Van Decker, enjoining them consistent with the terms of the Agreements;

B.  entry of a declaratory judgment in favor of Gartner, and against Faramo and Van Decker, finding that the conduct complained of is illegal and unfair and violates the Agreements between the Parties;

C.  for actual, compensatory, and exemplary damages to be determined at trial;

D.  attorneys' fees and costs; and

E.  such other and further relief the court deems just.

**<u>COUNT II</u>**
**Tortious Interference with Contractual Relations**

**(Injunctive Relief and Damages)**
**Against Hackett**

169.    Gartner realleges and incorporates by reference Paragraphs 1 through 168 as though fully set forth herein.

170.    Faramo and Van Decker signed valid and enforceable Agreements in which they promised, among other things, not to compete and not to disclose Gartner's trade secrets and confidential information.

171.    Hackett hired Faramo and Van Decker in roles substantively similar and directly competitive with their former roles at Gartner.  Hackett hired Faramo and Van Decker into roles which necessarily require them to breach their respective Agreements, as their employment constitutes a "Competitive Act" as defined in their Agreements.    Among other things, "[c]ompetitive [a]ct" is defined as: "(A) the development, production, marketing or selling of (or assisting others to develop, produce, market or sell): (x) syndicated research that competes with Gartner or its subsidiaries; or (y) a product or service which is competitive with the existing or planned products or services of the Company with which Employee was involved in or managed at any time during the last twenty-four (24) months of the Employment."  Agreements, Exs. A-B ¶ 6(a)(i).

172.    Hackett had knowledge of the Agreements and Faramo's and Van Decker's contractual obligations to Gartner.  Hackett knew its employment of Faramo and Van Decker would cause them to breach their Agreements with Gartner.

173.    Despite Gartner's efforts, Hackett refused to engage with Gartner or provide any assurances regarding Faramo's or Van Decker's employment with Hackett.

174.    Hackett intentionally interfered with Gartner and Faramo's and Van Decker's contractual relationships by inducing them to breach their contracts by joining Hackett.  Hackett

further interfered by inducing Faramo and Van Decker to disclose trade secrets and confidential information and join a competitive business, especially considering Hackett's aggressive transition into market intelligence and syndicated research to directly compete with Gartner. Hackett hired Faramo and Van Decker into a roles similar to their Gartner positions to draw directly on their knowledge of Gartner's business and experience gained at Gartner.

175.    Hackett hired Faramo and Van Decker into roles which will require them to engage in the research, development, production, marketing or selling of (or assist others to do so) a product or service which is competitive with the existing or planned products of Gartner with which Faramo and Van Decker were intimately involved during their employment with Gartner. Hackett has already hired a number of Gartner employees to further support Faramo and Van Decker in their roles at Hackett.

176.    Hackett's intentional interference with the contractual relationship between Gartner and Faramo and Van Decker was improper and without justification. Hackett knew they were bound by the restrictive covenants in their Agreements yet, nevertheless, improperly induced and knowingly and intentionally employed them in violation of those covenants.

177.    Hackett's actions were improper, unjustified, malicious, and in reckless disregard for Gartner's rights, entitling Gartner to damages. Hackett induced Faramo and Van Decker to violate their Agreements in furtherance of Hackett's scheme to hire former Gartner employees to build its workforce to unfairly compete with Gartner in its market intelligence and syndicated research business. Hackett has allowed and enabled Faramo and Van Decker to take Gartner's confidential and proprietary information. Hackett's unlawful scheme also seeks to increase its sales and generate more revenue at the expense of Gartner's business and with the help of Faramo's, Van Decker's, and others' knowledge and expertise.

178.    Gartner has suffered and will continue to suffer damages and irreparable harm as a direct result of Hackett's tortious interference with contractual relations, including diminished value of its confidential information, harm to its goodwill and reputation, and loss of its competitive advantage.

179.    Gartner's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory relief.

180.    Hackett's actions will continue to cause irreparable harm and damages to Gartner if not restrained.

**WHEREFORE**, Gartner prays for judgment against Hackett and requests the Court grant the following relief:

A.    Entry of a Preliminary Injunction and Permanent Injunction against Hackett enjoining it from interfering with Gartner's contractual relationships with Faramo and Van Decker and other Gartner employees subject to valid and enforceable post-employment obligations;

B.    for actual, compensatory, and exemplary damages to be determined at trial; and

C.    such other and further relief the court deems as just.

<u>**COUNT III**</u>
**Trade Secrets Misappropriation Under the Connecticut Uniform Trade Secrets Act**
**(Injunctive Relief and Damages)**
**Against All Defendants**

181.    Gartner realleges and incorporates by reference Paragraphs 1 through 180 as though fully set forth herein.

182.    The Connecticut Uniform Trade Secrets Act ("CUTSA") Conn. Gen. Stat. § 35-50 *et seq.*, prohibits the misappropriation of trade secrets.  Under the CUTSA, a trade secret means "information, including a formula, pattern, compilation, program, device, method, technique,

process, drawing, cost data or customer list that: (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Conn. Gen. Stat. § 35-51(d).

183.    Under the CUTSA, misappropriation means any of the following: "(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (2) disclosure or use of a trade secret of another without express or implied consent by a person who (A) used improper means to acquire knowledge of the trade secret; or (B) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was (i) derived from or through a person who had utilized improper means to acquire it; (ii) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, including but not limited to disclosures made under section 1-210, sections 31-40j to 31-40p, inclusive, or subsection (c) of section 12-62; or (iii) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or (C) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake." Conn. Gen. Stat. § 35-51(a).

184.    Gartner dedicated substantial time and resources towards developing its proprietary sales methodology, business methods and operations (including its various channels and industry verticals within its different business segments), research products, techniques, strategies, client lists, relationships with vendors, compilations of sensitive and proprietary client information, and other trade secrets, all of which provide economic value and give Gartner an advantage over its competitors who have not compiled this information. In particular, Gartner's trade secrets include

its sales methodology and techniques, research methodologies, product and service offerings (past, present and future), client and prospect identities, client entitlements, the pricing and structure of products and services, client engagement and purchasing information and go-to-market strategies for various Gartner solutions, among other things.

185.    This information required substantial resources to develop, and it is not publicly known.  At all relevant times, Gartner has made reasonable efforts to ensure its confidential and proprietary trade secrets remain confidential, proprietary, secret, and available for Gartner's commercial use only.  Gartner allows its employees access to this information only after they have executed confidentiality and non-competition agreements, like the Agreements.  Gartner also requires its employees, including Faramo and Van Decker, to undergo Data Protection Training as part of Gartner's provision of confidential information to employees.  Additionally, Gartner required Faramo to complete the GBS Ethical Selling Training Module and Affirmation as part of his GBS role and the provision of confidential information and trade secrets associated with it.

186.    Faramo and Van Decker had access to Gartner's confidential information and trade secrets.

187.    Specifically, Faramo had access to and knowledge of Gartner's proprietary sales methodology, Gartner's research methods, sales tools and insights, pricing, and sales strategies, in addition to Gartner's broader research processes, methodologies, analyses and strategies.  Faramo was intimately familiar with Gartner's "playbook" or various sales strategies for both AEs and BDs, which ensure Gartner obtains new business and keeps that business over time.

188.    Faramo was part of discussions at the leadership level regarding product strategy, forecasting for new products, new product launches, and what products to retire, which also included confidential customer feedback on these issues.

189.    Faramo knows the identities of many of Gartner's customers and those customers' needs, as well as their historical relationship with Gartner, including details of their sales spend with Gartner. He also understands how to leverage his own experience and Gartner's industry-focused research to meet those customers' needs.

190.    Faramo also had regular access to pipeline data across the GBS Marketing practice. This included detailed information regarding BDs' target opportunities, the anticipated size of the potential deal, the prospect's current stage in the pipeline, and the composition of the potential deal among other details Gartner curated from its research and prospect interfacing to ultimately close the deal.  With this information, Faramo could assess market trends, including what customers were demanding, what is on the horizon, and where the market is headed.  Faramo also received monthly reports from Gartner's Analysts which outlined customers' top inquiries, interests, and the most read pieces of Gartner research, further allowing him to stay ahead of the competition.

191.    Faramo understood and implemented Gartner's strategies for driving clients and prospects toward key issues and topics where Gartner could provide the most value and support, strengthening Gartner's relationships with those clients, securing prospects, and maintaining long-term relationships.  Faramo knows how to leverage Gartner's expertise and do the exact same thing for a competitor in the same space.

192.    As evidenced by his conduct in sending numerous Gartner documents to his personal email address upon interviewing and accepting his lucrative offer from Hackett, Faramo had access to Gartner's physical documents containing its proprietary, confidential and trade secret information, including documents relating to: (1) Gartner's sales methodology, (2) Gartner's actual sales training programs and various metrics, (3) Gartner's internal research, (4) Gartner's strategies

regarding market growth, and (5) Gartner's strategies to create demand for prospects in the marketplace. This list is merely illustrative based on Faramo's improper conduct.

193.    Many of the documents Faramo sent to his personal email address in the month preceding his resignation (and following receipt of his Hackett offer letter) were clearly marked "RESTRICTED." These documents have not been returned to Gartner.

194.    Van Decker had access to Gartner's proprietary and internal research which informed Gartner strategy and its research publications, client feedback, vendor briefings, the businesses operating in the markets, the priorities of these businesses, and how to establish the kind of meaningful and trusting relationships with these businesses that resulted in demand for Gartner products and services.

195.    Van Decker, through his employment with Gartner, developed well-established and strong vendor relationships with the various vendors in this space given his dealings with them year after year.

196.    Van Decker also has intimate knowledge of Gartner's clients by conducting, developing, and reviewing research via client, vendor and analyst networking, as well as evaluating and analyzing information and participating in research meetings and other activities.

197.    In their roles, Faramo and Van Decker had knowledge of and access to Gartner's confidential information and trade secrets.

198.    Faramo and Van Decker knew they had a duty to maintain the secrecy of Gartner's trade secrets due to their acknowledgement of such under the Agreements.

199.    Hackett is under a duty not to accept any misappropriated trade secrets, including Gartner's trade secrets.

200.    Hackett also is under a duty to not disclose or utilize misappropriated trade secrets for the purpose of gaining a competitive advantage in the industry.

201.    By virtue of Faramo's and Van Decker's new positions with Hackett, a direct Gartner competitor, and the information Faramo sent to his personal email address in the month preceding his resignation from Gartner, Faramo and Van Decker have threatened to misappropriate Gartner's trade secrets to compete unfairly with Gartner on behalf of Hackett.  These trade secrets include, but are not limited to, Gartner's proprietary information relating to Gartner's sales methodology; strategies to increase demand for Gartner's products in various industries and business segments; direct client feedback informing Gartner's research, client trends, and in-demand issues; research methodologies; product and service offerings (past, present and future); client and prospect identities; vendor relationships; client entitlements; pricing and structure of products and services; client engagement and purchasing information; and go-to-market strategies for various Gartner solutions.

202.    Upon information and belief, Hackett has not taken any actions to prevent Faramo or Van Decker from using or disclosing Gartner's trade secrets, and any such actions would be ineffectual.

203.    Hackett undoubtedly hired Faramo and Van Decker to benefit from their intimate knowledge of Gartner's trade secret, proprietary, and confidential information.

204.    In light of the similarities between Faramo's and Van Decker's Gartner and Hackett roles, and the fact the companies are direct competitors, Faramo and Van Decker will necessarily disclose or continue to disclose and utilize Gartner's trade secrets in the course of their Hackett employment.

205.    It is impossible for Faramo and Van Decker to separate the knowledge they acquired at Gartner from their directly parallel roles at Hackett, particularly where Hackett has made it exceedingly clear it is building, expanding, and aggressively pushing its market intelligence and syndicated research business segment.  For these reasons, they inevitably will disclose or continue to disclose, use and rely upon Gartner's trade secrets in their Hackett roles.

206.    Gartner has suffered and will continue to suffer damages and irreparable harm as a result of this misappropriation, including harm to its reputation, good will, customer relationships, and its competitive advantage.

207.    Gartner has no adequate remedy at law for such present and future harm, and therefore, is entitled to equitable relief in addition to compensatory relief.

208.    Defendants' actions will continue to cause irreparable harm and damages to Gartner if not enjoined.

209.    Additionally, because Defendants have committed the acts alleged herein willfully, in bad faith, from an improper motive amounting to malice, and in conscious disregard of Gartner's rights, Gartner is entitled to recover punitive damages from Defendants, in an amount according to proof at trial.

**WHEREFORE**, Gartner prays for judgment against Defendants, jointly and severally, and requests the Court grant the following relief:

A.  Entry of a Preliminary Injunction and a Permanent Injunction against Defendants, enjoining them from using, referencing, or disclosing Gartner's trade secrets under the Connecticut Uniform Trade Secrets Act, and any other applicable relief;

B.  For actual, compensatory, and exemplary damages to be determined at trial;

C. For attorneys' fees in accordance with the Connecticut Uniform Trade Secrets Act; and

Such other and further relief the court deems just.

**COUNT IV**
**Trade Secrets Misappropriation Under the Defend Trade Secrets Act**
**(Injunctive Relief and Damages)**
**Against All Defendants**

210.    Gartner realleges and incorporates by reference Paragraphs 1 through 209 as though fully set forth herein.

211.    The Defend Trade Secrets Act ("DTSA") of 2016, Pub. L. No. 114-153, 130 Stat. 376, which was passed into law on May 11, 2016 and amends chapter 90 of Title 18 of the U.S. Code, forbids threatened and actual misappropriation of trade secrets "if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1).

212.    Under the DTSA, "trade secret" means "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if, (A) the owner thereof has taken reasonable measures to keep such information secret, and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3).

213.    Under the DTSA, "misappropriation" means "(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by

improper means; or (B) disclosure or use of a trade secret of another without express or implied consent by a person who: (i) used improper means to acquire knowledge of the trade secret; or (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was: (I) derived from or through a person who had used improper means to acquire the trade secret; (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or (iii) before a material change of the position of the person, knew or had reason to know that (I) the trade secret was a trade secret and (II) knowledge of the trade secret had been acquired by accident or mistake." 18 U.S.C. § 1839(5).

214. Under the DTSA, "improper means" "(A) includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means; and (B) does not include reverse engineering, independent derivation, or any other lawful means of acquisition." 18 U.S.C. § 1839(6).

215. Gartner dedicated substantial time and resources towards developing its proprietary sales methodology, business methods and operations (including its various channels and industry verticals within its different business segments), research products, techniques, strategies, client lists, relationships with vendors, compilations of sensitive and proprietary client information, and other trade secrets, all of which provide economic value and give Gartner an advantage over its competitors who have not compiled this information. In particular, Gartner's trade secrets include its sales methodology and techniques, research methodologies, product and service offerings (past, present and future), client and prospect identities, client entitlements, the pricing and structure of

products and services, client engagement and purchasing information and go-to-market strategies for various Gartner solutions, among other things.

216.    This information required substantial resources to develop, and it is not publicly known.  At all relevant times, Gartner has made reasonable efforts to ensure its confidential and proprietary trade secrets remain confidential, proprietary, secret, and available for Gartner's commercial use only.  Gartner allows its employees access to this information only after they have executed confidentiality and non-competition agreements, like the Agreements. Gartner also requires its employees, including Faramo and Van Decker, to undergo Data Protection Training as part of Gartner's provision of confidential information to employees. Additionally, Gartner required Faramo to complete the GBS Ethical Selling Training Module and Affirmation as part of his GBS role and the provision of confidential information and trade secrets associated with it.

217.    Gartner uses its trade secrets in its global work and necessarily in interstate commerce.

218.    The trade secrets hold independent economic value for Gartner and are developed at Gartner's considerable time and expense.

219.    Faramo and Van Decker had access to Gartner's confidential information and trade secrets.

220.    Specifically, Faramo had access to and knowledge of Gartner's proprietary sales methodology, Gartner's research methods, sales tools and insights, pricing, and sales strategies, in addition to Gartner's broader research processes, methodologies, analyses and strategies.  Faramo was intimately familiar with Gartner's "playbook" for various sales strategies for both AEs and BDs, which ensure Gartner obtains new business and keeps that business over time.

221.    Faramo was part of discussions at the leadership level regarding product strategy, forecasting for new products, new product launches, and what products to retire, which also including confidential customer feedback on these issues.

222.    Faramo knows the identities of many of Gartner's customers and those customers' needs, as well as their historical relationship with Gartner, including details of their sales spend with Gartner.

223.    Faramo also had regular access to pipeline data across the GBS Marketing practice. This included detailed information regarding BDs' target opportunities, the anticipated size of the potential deal, the prospect's current stage in the pipeline, and the composition of the potential deal among other details Gartner curated from its research and prospect interfacing to ultimately close the deal.  With this information, Faramo could assess market trends, including what customers were demanding, what is on the horizon, and where the market is headed.  Faramo also received monthly reports from Gartner's Analysts which outlined customers' top inquiries, interests, and the most read pieces of Gartner research, further allowing him to stay ahead of the competition.

224.    Faramo understood and implemented Gartner's strategies for driving clients and prospects toward key issues and topics where Gartner could provide the most value and support, strengthening Gartner's relationships with those clients, securing prospects, and maintaining long-term relationships.  Faramo knows how to leverage Gartner's expertise and do the exact same thing for a competitor in the same space.

225.    As evidenced by his conduct in sending numerous Gartner documents to his personal email address, Faramo had access to Gartner's physical documents containing its proprietary, confidential and trade secret information, including documents relating to: (1)

Gartner's sales methodology, (2) Gartner's actual sales training programs and various metrics, (3) Gartner's internal research, (4) Gartner's strategies regarding market growth, and (5) Gartner's strategies to create demand for prospects in the marketplace. This list is merely illustrative based on Faramo's improper conduct.

226.    Many of the documents Faramo sent to his personal email address in the month preceding his resignation (and following receipt of his Hackett offer letter) were clearly marked "RESTRICTED." These documents have not been returned to Gartner.

227.    Van Decker had access to Gartner's proprietary and internal research which informed Gartner strategy and its research publications, client feedback, vendor briefings, the businesses operating in the markets, the priorities of these businesses, and how to establish the kind of meaningful and trusting relationships with these businesses that resulted in demand for Gartner products and services.

228.    Van Decker, through his employment with Gartner, developed well-established and strong vendor relationships with the various vendors in this space given his dealings with them year after year.

229.    Van Decker also has intimate knowledge of Gartner's clients by conducting, developing, and reviewing research via client, vendor and analyst networking, as well as evaluating and analyzing information and participating in research meetings and other activities.

230.    In their roles, Faramo and Van Decker had knowledge of and access to Gartner's confidential information and trade secrets.

231.    Faramo and Van Decker knew they had a duty to maintain the secrecy of Gartner's trade secrets due to their acknowledgement of such under the Agreements.

232.    Hackett is under a duty not to accept any misappropriated trade secrets, including Gartner's trade secrets.

233.    Hackett also is under a duty to not disclose or utilize misappropriated trade secrets for the purpose of gaining a competitive advantage in the industry.

234.    By virtue of Faramo's and Van Decker's new positions with Hackett, a direct Gartner competitor, and the information Faramo sent to his personal email address in the month preceding his resignation from Gartner, Faramo and Van Decker have threatened to misappropriate Gartner's trade secrets to compete unfairly with Gartner on behalf of Hackett.  These trade secrets include, but are not limited to, Gartner's proprietary information relating to Gartner's sales methodology; strategies to increase demand for Gartner's products in various industries and business segments; direct client feedback informing Gartner's research, client trends, and in-demand issues; research methodologies; product and service offerings (past, present and future); client and prospect identities; vendor relationships; client entitlements; pricing and structure of products and services; client engagement and purchasing information; and go-to-market strategies for various Gartner solutions.

235.    Upon information and belief, Hackett has not taken any actions to prevent Faramo or Van Decker from using or disclosing Gartner's trade secrets, and any such actions would be ineffectual.

236.    Hackett undoubtedly hired Faramo and Van Decker to benefit from their intimate knowledge of Gartner's trade secret, proprietary, and confidential information.

237.    In light of the similarities between Faramo's and Van Decker's Gartner and Hackett roles, and the fact the companies are direct competitors, Faramo and Van Decker will necessarily

disclose or continue to disclose and utilize Gartner's trade secrets in the course of their Hackett employment.

238.    It is impossible for Faramo and Van Decker to separate the knowledge they acquired at Gartner from their directly parallel roles at Hackett, particularly where Hackett has made it exceedingly clear it is building, expanding, and aggressively pushing its market intelligence and syndicated research business segment.  For these reasons, they inevitably will disclose or continue to disclose, use and rely upon Gartner's trade secrets in their Hackett roles.

239.    Gartner has suffered and will continue to suffer damages and irreparable harm as a result of this misappropriation, including harm to its reputation, good will, customer relationships, and its competitive advantage.

240.    Gartner has no adequate remedy at law for such present and future harm and therefore, is entitled to equitable relief in addition to compensatory relief.

241.    Defendants' actions will continue to cause irreparable harm and damages to Gartner if not enjoined.

242.    Additionally, because Defendants have committed the acts alleged herein willfully, in bad faith, from an improper motive amounting to malice, and in conscious disregard of Gartner's rights, Gartner is entitled to recover punitive damages from Defendants, in an amount according to proof at trial.

**WHEREFORE**, Gartner prays for judgment against Defendants, jointly and severally, and requests the Court grant the following relief:

      A.  entry of a Preliminary Injunction and Permanent Injunction against Defendants, enjoining them from using, referencing, or disclosing Gartner's trade secrets under the Defend Trade Secrets Act, and any other applicable relief;

B.  for actual, compensatory, and exemplary damages to be determined at trial;

C.  for attorneys' fees in accordance with the Defend Trade Secrets Act; and

D.  such other and further relief the court deems just

**COUNT V**
**Breach of Duty of Loyalty**
**(Damages)**
**Against Faramo**

243.    Gartner realleges and incorporates by reference Paragraphs 1 through 242 as though fully set forth herein.

244.    Faramo owed Gartner a duty of loyalty at all times during his employment.

245.    Faramo was obligated to act in the best interests of Gartner at all times during his employment.

246.    Faramo was obligated to act in good faith in any matter relating to Gartner at all times during his employment.

247.    In the month leading up to his last day of employment, including after Faramo received his Hackett offer letter and after he provided notice of his resignation to Gartner, Faramo sent a number of internal Gartner documents containing proprietary, confidential, and trade secret information to his personal email address.  These documents included the following information:

a.  a grid outlining Gartner's competencies used to measure sales success, which can be used to build an identical framework for a competitor;

b.  detailed information regarding Gartner's sales training programs, many of which are marked "RESTRICTED DISTRIBUTION";

c.  charts documenting Gartner's "levers to increase growth" and internal commentary regarding Gartner growth metrics;

d.  Gartner's internal research regarding Chief Sales Officer success;

e.  Gartner intellectual property (including slide decks and talking points) created for customers who subscribe to Gartner's Chief Sales Officer Research and Advisory

services, which are explicitly marked "RESTRICTED DISTRIBUTION" and "NOT FOR EXTERNAL DISTRIBUTION"; and

    f.    Gartner intellectual property (including slide decks and notes) documenting Gartner's proprietary process and methodology to drive clients and prospects toward certain topics and issues where Gartner can add the most value and support and increase demand for its products and services, which are explicitly marked "RESTRICTED DISTRIBUTION."

248.    Faramo had no reason to send these documents to his personal email address in the course of his day-to-day duties, especially when he was planning on resigning and joining a direct competitor.

249.    Faramo has not returned any of these documents to Gartner.

250.    Faramo sent the information set forth above in sub-paragraph 108(c) to his personal email address after he provided his resignation notice to Gartner but prior to his last day of employment.

251.    These documents constitute "Confidential Information" as defined by the Faramo Agreement, even those not marked as "restricted."

252.    By sending these confidential and proprietary documents to his personal email address after he received his Hackett offer letter and after he provided his notice of resignation to Gartner, Faramo violated his duty of loyalty owed to Gartner.

253.    Faramo was not acting in the best interests of Gartner or in good faith in sending this information to his personal email address when he planned to join a direct competitor shortly thereafter.

254.    Faramo's actions have damaged and will continue to damage Gartner to the benefit of Faramo and his new employer and Gartner's competitor, Hackett.

**WHEREFORE**, Gartner prays for judgment against Faramo and requests the Court grant the following relief:

A.  for actual, compensatory, and exemplary damages to be determined at trial; and

B.  such other and further relief the court deems just.

## PRAYER FOR RELIEF

With respect to this Complaint, and based on the foregoing, Plaintiff Gartner, Inc. prays for the following relief:

1.  entry of a Preliminary Injunction and Permanent Injunction against Faramo and Van Decker enjoining them from using or disclosing Gartner's trade secrets and proprietary and confidential information, and from committing further violations of their non-competition or non-solicitation obligations to Gartner, for the full term of such restrictions, as contemplated by the Agreements' tolling provisions;

2.  entry of a Preliminary Injunction and Permanent Injunction against Hackett, enjoining it from further interfering with Gartner's contractual relationships with its employees and from using Gartner's trade secrets and proprietary and confidential information;

3.  entry of a Preliminary Injunction and Permanent Injunction against Faramo, Van Decker, and Hackett, enjoining them from using, referencing, or disclosing Gartner's trade secrets under the Connecticut Uniform Trade Secrets Act;

4.  entry of a Preliminary Injunction and Permanent Injunction against Faramo, Van Decker, and Hackett, enjoining them from using, referencing, or disclosing Gartner's trade secrets under the Defend Trade Secrets Act;

5.  for actual, compensatory, treble, punitive and exemplary damages to be determined at trial;

6.  attorneys' fees and costs; and

7.  such other and further relief the court deems as just.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff Gartner, Inc. hereby asserts its right to a trial by jury on all counts so triable.

Dated:  May 26, 2023

Respectfully submitted,

GARTNER, INC.

By:  */s Daniel A. Schwartz*
Daniel A. Schwartz (ct15823)
Sheridan L. King (ct31197)
**SHIPMAN & GOODWIN LLP**
One Constitution Plaza
Hartford, Connecticut 06103
Tel: (860) 251-5038
DSchwartz@goodwin.com
sking@goodwin.com

Christopher Collins
Bar No.: CT29869
**SHEPPARD MULLIN RICHTER & HAMPTON LLP**
30 Rockefeller Plaza
New York, NY 10112
Tel: (212) 653-8700
Fax: (212) 653-8701

Kevin M. Cloutier, Esq.
(*pro hac vice* admission pending)
Illinois Bar No.: 6273805
**SHEPPARD MULLIN RICHTER & HAMPTON LLP**
321 North Clark Street, 32nd Floor
Chicago, Illinois 60654
Tel: (312) 499-6300
Fax: (312) 499-6301
kcloutier@sheppardmullin.com

*Counsel for Plaintiff Gartner, Inc.*