**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| GARTNER, INC., a Delaware corporation, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 3:23-cv-00688 |
| | ) | |
| THE HACKETT GROUP, INC., a Florida | ) | |
| corporation, JEFFREY FARAMO, an | ) | |
| individual, and JOHN VAN DECKER, an | ) | |
| individual, | ) | |
| | ) | June 5, 2023 |
| Defendants. | ) | |
| | ) | |

**PLAINTIFF GARTNER, INC.'S**
**MEMORANDUM IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION**

ORAL ARGUMENT REQUESTED

## TABLE OF CONTENTS

Page

I.   INTRODUCTION ............................................................................................1

II.  RELEVANT FACTUAL BACKGROUND................................................................3

     A.   Gartner's Business. ...........................................................................3

     B.   Faramo's Employment with Gartner. .....................................................4

          1.   Faramo's Employment Agreement with Gartner...........................8

          2.   Faramo's Pre-Resignation Misconduct and Employment with
               Hackett. ..........................................................................10

     C.   Van Decker's Employment with Gartner. ..............................................11

          1.   Van Decker's Employment Agreement with Gartner.....................13

          2.   Van Decker's Resignation from Gartner and Employment with
               Hackett. ..........................................................................14

     D.   Hackett's Business and Its New Plan for Directly Competing with Gartner.........15

     E.   Gartner's Post-Employment Correspondence with Faramo and Van Decker.
          ..........................................................................................17

III. GARTNER IS ENTITLED TO A PRELIMINARY INJUNCTION .................................19

     A.   Gartner Has A Strong Likelihood Of Success On The Merits............................19

          1.   Gartner is Likely to Succeed on the Merits of its Breach of Contract
               Claims. ...........................................................................19

               a.   The Agreements Are Valid and Enforceable Contracts................20

                    (i)    The Non-Competition Covenants in the Agreements
                           are Supported by Adequate Consideration. .......................20

                    (ii)   The Non-Competition Covenants are Reasonable
                           and Necessary to Protect Gartner's Legitimate
                           Business Interests.................................................21

                           1).   The Temporal and Geographic Limits Are
                                 Fair and Reasonable Given Faramo's and
                                 Van Decker's Knowledge and the Global
                                 Nature of Gartner's Business. ..............................22

                           2).   The Agreements Do Not Restrain the
                                 Individual Defendants From Earning a
                                 Living and Are Consistent with the Public's
                                 Interest.................................................23

               b.   Gartner Satisfies the Remaining Elements of its Breach of
                    Contract Claim. ..............................................................24

2.      Gartner Is Likely to Succeed on the Merits of Its Misappropriation of Trade Secrets Claims Against Faramo and Van Decker. ......................26

a.      Gartner's Pricing, Client Information, Products, Services, Business Plans and Strategies Constitute Trade Secrets................27

b.      Disclosure of Gartner's Trade Secrets is Threatened and Imminent. ....................................................................................31

3.      Hackett Tortiously Interfered With the Individual Defendants' Employment Agreements with Gartner. .......................................34

IV.     GARTNER   WILL   SUFFER   IRREPARABLE   HARM   ABSENT   A PRELIMINARY INJUNCTION. .......................................................36

A.      Irreparable Harm Is Presumed Due To The Threatened Disclosure Of Gartner's Trade Secrets..........................................................36

B.      Beyond The Presumption of Irreparable Harm, Gartner Has Established that It Has Suffered—and Will Continue To Suffer—Irreparable Harm. ...................37

V.      THE BALANCE OF EQUITIES FAVORS GARTNER, AND THE ISSUANCE OF A PRELIMINARY INJUNCTION WILL NOT HARM THE PUBLIC INTEREST..................................................................................38

VI.     CONCLUSION ..................................................................................40

# **TABLE OF AUTHORITIES**

**Page(s)**

Cases

*29 Main St. LLC v. United States Postal Serv.*
    2022 U.S. Dist. LEXIS 139928 (D. Conn. Apr. 22, 2022) ....................................40

*3M v. Francavilla*
    191 F. Supp. 2d 270 (D. Conn. 2002) ...................................................................20

*A.H. Harris & Sons, Inc. v. Naso*
    94 F. Supp. 3d 280 (D. Conn. 2015) ..................................................20, 36, 37, 39

*Advanced Arm Dynamics of New Eng. LLC v. Comprehensive Prosthetic Servs. LLC*
    No. CV 06-5004605S, 2011 Conn. Super. LEXIS 182 (Super. Ct. Feb. 23, 2011) ...............22

*Americus Dental Labs, Inc. v. Pincheira*
    No. 3:05CV1208(RNC), 2006 U.S. Dist. LEXIS 109301 (D. Conn. Mar. 3, 2006) ..............20

*Applied Advert. v. Jacobs*
    No. HHDCV156059689S, 2020 Conn. Super. LEXIS 584 (Super. Ct. May 20, 2020)..........22

*ATI Eng'g Servs., LLC v. Millard*
    No. NNHCV186079777S, 2018 Conn. Super. LEXIS 3630 (Super. Ct. Aug. 7, 2018) .........26

*Avery Dennison Corp. v. Finkle*
    No. CV010757706, 2002 WL 241284 (Conn. Super. Ct. Feb. 1, 2002) .................................31

*Blue Cross & Blue Shield of Conn., Inc. v. DiMartino*
    No. 30 06 42, 1991 Conn. Super. LEXIS 1570 (Super. Ct. July 2, 1991)..............................28

*Branson Ultrasonics Corp. v. Stratman*
    921 F. Supp. 909 (D. Conn. Feb. 28, 1996)................................................................33, 34, 38

*CCT Comms., Inc. v. Zone Telecom, Inc.*
    327 Conn. 114, 172 A.3d 1228 (2017) ..................................................................................19

*Companions & Homemakers, Inc. v. A&B Home Care Sols., LLC*
    No. HHDCV176075627S, 2018 WL 1137546 (Conn. Super. Ct. Jan. 30, 2018) ..................35

*D'Amico v. Schiavone Realty & Dev. Corp.*
    No. CVNH 8205110, 1982 Conn. Super. LEXIS 386 (1982) ...........................................37, 38

*DeLeo v. Equale & Cirone, LLP*
    202 Conn. App. 650, 246 A.3d 988 (2021) ..........................................................................24

*Dymax Corp. v. Kalach*
No. 22-cv-00516, 2022 U.S. Dist. LEXIS 65404 (D. Conn. Apr. 8, 2022)............................40

*Elm City Cheese Co. v. Federico*
251 Conn. 59, 752 A.2d 1037 (1999) ...................................................................27

*Entegee, Inc. v. Korwek*
No. 15-cv-1087 (VLB), 2015 WL 5202902 (D. Conn. Sept. 4, 2015) ........................24, 39, 40

*Friese v. Fadner Media Enters., LLC*
No. FSTCV146021437, 2017 Conn. Super. LEXIS 126 (Super. Ct. Jan. 18, 2017)..............23

*Genworth Fin. Wealth Mgmt. v. McMullan*
721 F. Supp. 2d 122 (D. Conn. June 10, 2010)................................................36, 38

*Glossip v. Gross*
576 U.S. 863 (2015) ......................................................................................19

*Groupon, Inc. v. Sung Shin*
2022 WL 60526 (N.D. Ill. January 6, 2022) ..........................................................34

*HCAFranchise Corp. v. Alisch*
2016 WL 10706285 (N.D. Ind. Aug. 12, 2016)........................................................38

*Jacobson & Co. v. Armstrong Cork Co.*
548 F.2d 438 (2d Cir. 1977)..............................................................................39

*Landmark Inv. Grp., LLC v. CALCO Constr. & Dev. Co.*
138 Conn. 847 (2015) .....................................................................................34

*Mastrio v. Sebelius*
768 F.3d 116 (2d Cir. 2014)..............................................................................39

*ML Fashion, LLC v. Nobelle GW, LLC*
No. 3:21-CV-00499, 2022 WL 313965 (D. Conn. Feb. 2, 2022)...........................31

*New Haven Tobacco Co. v. Perrelli*
18 Conn. App. 531, 559 A.2d 715 (1989) .............................................................21

*Onward Search LLC v. Noble*
No. 3:22-cv-00369 (VAB), 2022 WL 2669520 (D. Conn. July 11, 2022)..................19

*Osborne v. Locke Steel Chain Co.*
153 Conn. 527, 218 A.2d 526 (1966) ..................................................................20

*Scott v. General Iron & Welding Co.*
171 Conn. 132, 368 A.2d 111 (1976) ..................................................................21

*Sunbelt Rentals, Inc. v. McAndrews*
    552 F. Supp. 3d 319 (D. Conn. Aug. 5, 2021) .................................................................27, 32

*United Rentals, Inc. v. Bastanzi*
    No. 3:05CV596 (RNC), 2005 U.S. Dist. LEXIS 45268 (D. Conn. Dec. 22, 2005) ....23, 24, 36

*United Rentals, Inc. v. Frey*
    CIV. No. 3:10CV1628 (HBF), 2011 WL 693013 (D. Conn. Feb. 17, 2011) ..............21, 22, 36

*Weiss v. Wiederlight*
    208 Conn. 525, 546 A.2d 216 (1988) ....................................................................................22

*Weseley Software Dev. Corp. v. Burdette*
    977 F. Supp. 137 (D. Conn. Dec. 30, 1996) ..........................................................................22

<u>Statutes</u>

18 U.S.C. § 1839(3) ....................................................................................................................27

Connecticut General Statutes § 35-51(d) ....................................................................................27

Connecticut Uniform Trade Secrets Act ........................................................................19, 27, 31

Defend Trade Secrets Act ................................................................................................19, 27, 31

<u>Other Authorities</u>

Federal Rules of Civil Procedure 65 ..............................................................................................1

https://pages.awscloud.com/rs/112-TZM-766/images/Hackett_Business-impact-of-cloud-
    adoption-for-industrial-manufacturers.pdf?sc_channel=cfm-
    blog&sc_campaign=maximizing-business-impact-of-cloud-adoption-for-industrial-
    manufacturers&sc_medium=cfm&sc_content=cfm-
    blog&sc_detail=link&sc_outcome=aw&sc_publisher=cfm-
    awareness&trk=maximizing-business-impact-of-cloud-adoption-for-industrial-
    manufacturers_cfm-blog_link (last accessed on May 18, 2023) ...............................................14

https://www.thehackettgroup.com/about/ .....................................................................................15

https://www.thehackettgroup.com/about/ (last accessed on May 8, 2023) .............................15, 16

https://www.thehackettgroup.com/business-transformation-hackett/ (last accessed on June
    2, 2023) ..................................................................................................................................15

https://www.thehackettgroup.com/podcast/2023-enterprise-key-issues-research/     (last
    accessed on May 18, 2023)....................................................................................................15

Restatement (Second) of Torts § 766 Comment m........................................................................35

Restatement (Second) of Torts § 768 Comment i..........................................................................35

## TABLE OF EXHIBITS

| Exhibit No | Description |
|---|---|
| 1 | Declaration of Marcio Krug |
| 2 | Declaration of Paul Miller |
| 3 | Declaration of Lesley T. Whedbee-Pluscec |
| 3A | Agreement Regarding Certain Conditions of Employment – Jeffrey Faramo |
| 3B | Agreement Regarding Certain Conditions of Employment – John Van Decker |
| 3C | Emails sent from Jeffrey Faramo's Email Address (To be filed under seal) |
| 4 | 2/22/23 Offer Letter from Hackett Group to Jeff Faramo |
| 5 | Excerpts from Hackett Group 2022 Annual Report |
| 6 | Excerpts from Hackett Group Q4 2022 Earnings Call |
| 7 | 4/7/23 Sheppard Mullin Richter & Hampton LLP Letter to Jeffrey Faramo |
| 8 | 4/7/23 Sheppard Mullin Richter & Hampton LLP Letter to John Van Decker |
| 9 | 4/6/23 Email from Sheppard Mullin Richter & Hampton LLP to Hackett Group with copies of Faramo and Van Decker Agreements |
| 10 | 4/14/23 Response Letter from Hackett to Sheppard Mullin Richter & Hampton LLP |
| 11 | 5/4/23 Emails Between Gartner and Hackett |

Pursuant to FRCP Rule 65, Plaintiff Gartner, Inc. ("Gartner") moves for a preliminary injunction enjoining: (i) Defendants Jeffrey Faramo ("Faramo") and John Van Decker ("Van Decker," together with Faramo, the "Individual Defendants") from breaching their contractual obligations to Gartner and from using Gartner's trade secret information; and (ii) Defendant The Hackett Group, Inc. ("Hackett," collectively with Faramo and Van Decker, the "Defendants") from tortiously interfering with the Individual Defendants' enforceable employment agreements.

## I.    INTRODUCTION

The Individual Defendants, both long-tenured leaders at Gartner, defected to a direct competitor in violation of their lawful post-employment obligations.  Making matters worse, before defecting to Hackett, Faramo misappropriated volumes of Gartner trade secrets.  Hackett has taken no action to curb the Individual Defendants' unlawful conduct, nor will they even engage with Gartner about the roles the Individual Defendants are performing.  Instead, Hackett is content tortiously interfering with the Individual Defendants' contractual obligations to Gartner in order to capitalize on their misdeeds and to enhance their own competitive offerings to Gartner's detriment.  Immediate injunctive relief is necessary and appropriate in these circumstances.

Hackett and Gartner are direct competitors.  Gartner is a global research and advisory firm that provides clients with indispensable insights, advice and tools. Gartner delivers independent, objective research, advice, and guidance to leaders across an enterprise through subscription services that include on-demand access to published research content.  Like Gartner, Hackett offers syndicated research, advisory services, and market intelligence, among other offerings.

In an effort to steal Gartner's market share, Hackett recently expanded its syndicated research offerings to directly compete with Gartner as part of its "Transformative Business Plan." Hackett's investment in its syndicated research development and market intelligence offerings is its self-proclaimed primary focus for 2023.  Rather than investing the extensive time and resources

-1-

required to develop such offerings on its own, Hackett took a short-cut by targeting the Individual Defendants to unfairly capitalize on the specialized training and unique knowledge Gartner provided them. The Individual Defendants have direct knowledge of Gartner strategic information concerning its business methodologies and opportunities. Faramo also has detailed knowledge of Gartner's sales strategies and methodologies, which are unique and proprietary to Gartner.

The Individual Defendants executed valid employment agreements with reasonable post-employment restrictive covenants aimed at protecting Gartner's trade secret information. Nonetheless, they have joined Hackett in roles that not only violate their employment agreements, but also risk the unauthorized disclosure of Gartner's trade secret information.

It will be impossible for the Individual Defendants to perform their roles at Hackett without utilizing the trade secrets they learned about Gartner's clients, research, methodologies, and strategies. They will undoubtedly rely upon and inevitably disclose this same trade secret information. In employing the Individual Defendants, Hackett knew it was inducing a breach of their lawful contractual obligations to Gartner, breaches that will diminish the value of Gartner's trade secrets and undermine Gartner's position in the industry. This is no doubt why the Individual Defendants refused to disclose that they were joining Hackett upon leaving Gartner, and similarly refused to share any information about their roles there when Gartner sought confirmation that they were abiding by their post-employment obligations.

Because the Individual Defendants' positions at Hackett will inevitably require them to rely on Gartner's critical trade secrets, their employment with Hackett will cause Gartner irreparable harm. Gartner therefore seeks injunctive relief to protect its interests.

## II.    RELEVANT FACTUAL BACKGROUND

### A.    Gartner's Business.

Gartner is a global research and advisory firm that provides clients with indispensable and enterprise-wide insights, advice, and tools to help them achieve their mission critical priorities. Krug Decl., Ex. 1, ¶ 5; Miller Decl., Ex. 2, ¶ 5.  Gartner delivers its products and services globally through several distinct business segments.  Miller Decl., Ex. 2, ¶ 6.  Gartner's largest sales channel is its Global Technology Sales ("GTS") organization, which sells products and services to users and providers of technology, while its Global Business Sales ("GBS") organization sells products and services to other functional leaders, such as those in human resources, supply chain, marketing, and finance.  Krug Decl., Ex. 1, ¶ 6.

Gartner's Research and Advisory business delivers independent, objective research, advice, and guidance to leaders across an enterprise through subscription services that include on-demand access to published research content.  Miller Decl., Ex. 2, ¶ 6.  Within the Research and Advisory business, there are numerous teams that specialize in distinct roles, industries, or market segments, including, among others, Finance Applications ("Finance Apps"), Enterprise Resource Planning Solutions ("ERP"), and Technology & Service Providers ("TSP").  *Id.*, ¶ 8.  These groups create must-have research, market predictions, and best practices for C-level executives and their teams who operate within those industries and market segments.  *Id.*

Gartner's Finance Apps coverage focuses on the digitalization of finance business processes to enable finance transformation, process optimization, and data-driven decision-making.  Miller Decl., Ex. 2, ¶ 13.  Gartner's ERP coverage focuses on maximizing the business value of the complex integrated suite of business applications used to run the day-to-day business activities of an enterprise.  *Id.*  Financials is a foundational component of ERP.  *Id.*  Gartner's TSP

segment provides must-have research and advice to help technology and communications leaders better understand and grow their businesses. *Id.*, ¶ 17.

To provide its clients with the sophisticated information and analysis they demand, Gartner publishes, among other things, Magic Quadrants ("MQs"), which are a series of market research reports that demonstrate market trends for a variety of technology-based industries based on Gartner's proprietary qualitative data analysis. Miller Decl., Ex. 2, ¶ 7. A significant amount of the data analyzed in the MQs is gathered through Gartner's vendor briefings in which vendors educate Gartner's analysts and advisors about their businesses, including their place within the industry and their vision for the future of their companies. *Id.* Gartner regularly publishes MQs and other market guides in its Finance Apps and ERP segments. *Id.*, ¶ 19.

Gartner distinguishes itself from its competitors based on its talented employees and delivery of high-quality products and services that it has developed through significant time and expense. Krug Decl., Ex. 1, ¶ 7; Miller Decl., Ex. 2, ¶ 9. To maintain its position as an industry leader and its strong customer relationships, Gartner has developed a proprietary and confidential sales strategy and methodology that is unique to Gartner. Krug Decl., Ex. 1, ¶ 8. In addition, Gartner has spent years investing in its Sales Learning & Development organization to improve, evolve, and refine Gartner's sales strategy, which is Gartner's secret to success and critical to its competitive edge in the marketplace. *Id.*, ¶ 15.

**B.  Faramo's Employment with Gartner.**

Faramo began his employment with Gartner in 2004 as an Account Executive in GTS. Whedbee-Pluscec Decl., Ex. 3, ¶ 5. Over the next nineteen years, he worked his way through various leadership roles in different parts of Gartner's GTS and GBS channels, including: (i) Strategic Account Executive; (ii) Manager, Sales Training and Development; (iii) Global Director,

Sales Training and Development; (iv) Managing Director, Business Development; (v) Regional Vice President, Sales, State and Local Government; and (vi) Managing Vice President, Sales. *Id.*

Each of these experiences informed Faramo's deep Gartner expertise. In Gartner's Midsize Enterprise ("MSE") business within GTS, for example, Faramo learned how to showcase and sell Gartner's offerings to small and medium-sized businesses. Krug Decl., ¶ 10. In the America's Large Enterprise ("ALE") channel of GTS, Faramo parlayed his MSE experience into serving larger enterprises. *Id.* Armed with this knowledge, Faramo spent almost two decades managing sales teams that sold Gartner's GTS and GBS offerings to different-sized companies and the different functional leaders within those organizations. *Id.*

During his time at Gartner, Faramo also served as a trainer, manager, and director in Gartner's Sales Learning & Development organization. Krug Decl., Ex. 1, ¶ 14. Indeed, Faramo was so uniquely qualified in Gartner's sales processes and methodologies that he was entrusted to train the next generation of Gartner's sales professionals across the world on the proprietary and confidential sales methodologies that made him – and Gartner – so successful. *Id.*

Faramo also worked closely with both Gartner's Account Executives ("AEs") and Business Developers ("BDs") throughout his tenure. Krug Decl., Ex. 1, ¶ 16. Gartner's AEs are primarily responsible for fostering and growing existing client relationships, while BDs are the hunters who bring in new business. *Id.* Faramo was intimately familiar with Gartner's "playbook" for various sales strategies for both AEs and BDs and had access to Gartner documents and information detailing these strategies and Gartner's overall sales methodology. *Id.* These strategies represent some of the prime sources of Gartner's long-term success in obtaining new business and keeping and growing existing business over time. *Id.*, ¶ 17. Faramo understood and implemented these

strategies to drive demand for Gartner's products and services to increase its market share and obtain new clients in various segments.  *Id.*, ¶ 26.

In January 2018, Faramo was promoted to Managing Vice President for the North American Marketers Team within GBS, focused on selling Gartner's products and services to Chief Marketing Officers, a position he held until his resignation.  Krug Decl., Ex. 1, ¶¶ 11, 18-19.  Gartner promoted Faramo to this role to help blend a team of sales professionals from three different entities acquired by Gartner with a team of legacy Gartner employees under a single Gartner umbrella.  *Id.*, ¶ 11.  As part of the ongoing effort to integrate these companies into one, Faramo was part of discussions at the leadership level regarding product strategy, forecasting for new products, new product launches, and what products to retire.  *Id.*, ¶ 12.  Faramo was exposed to detailed customer feedback regarding Gartner's offerings and the related strategy for product-related decisions.  *Id.*  Faramo also managed teams of sales leaders and executives with an eye towards growing Gartner's strategic client relationships and revenue.  *Id.*, ¶ 19.

At the time he resigned, Faramo was working on a project to identify certain verticals within the Marketing sales practice to optimize Gartner's offerings.  Krug Decl., Ex. 1, ¶ 20.  This required Faramo to know and understand the identities of Gartner's customers in this space and to leverage his own experience and Gartner's industry-focused research to meet their needs.  *Id.*  Faramo also had access to Gartner's "Org Base" platform that stores information related to each customer's relationship with Gartner, as well as information about prospective customers.  *Id.*, ¶ 21.

Faramo also had regular access to pipeline data across the GBS Marketing practice.  Krug Decl., Ex. 1, ¶ 22.  This included detailed information regarding BDs' target opportunities, the anticipated size of the potential deal, the prospect's current stage in the pipeline, the composition

of the potential deal, and other details Gartner curated from its research and prospect interfacing to ultimately close the deal. *Id.* This information allowed Faramo to continually assess market trends, including what customers were demanding, what is on the horizon, and where the market is headed. *Id.*, ¶ 23. Faramo also received monthly reports from Gartner's Analysts which outlined customers' top inquiries and interests, further allowing him to stay ahead of the competition. *Id.*

To fulfill the various roles he served at Gartner, Faramo had access to and a deep understanding of Gartner confidential and trade secret information, including its product and service offerings, strategic discussions regarding the future of Gartner's products, the identities of Gartner's client and prospective clients, client and prospects priorities, pricing and structure of products and services, client engagement and purchasing information, go-to-market strategies for various Gartner solutions, and how to best position the appropriate Gartner solutions against any competitive offerings. Krug Decl., Ex. 1, ¶ 24. And in his extensive role in training Gartner's salesforce, Faramo became intimately familiar with Gartner's proprietary sales methodologies, and how to drive demand for Gartner offerings to obtain new business. *Id.*, ¶ 25.

Faramo expressly acknowledged the confidential and proprietary nature of this information in various employment agreements. Whedbee-Pluscec Decl., Ex. 3, ¶ 6. Gartner also required Faramo to attend and successfully complete Gartner's Data Protection Training, which outlines Gartner employees' data protection responsibilities and underscores the importance of protecting and safeguarding Gartner's confidential information. *Id.*, ¶¶ 10, 12. Gartner undertook additional reasonable measure to protect its confidential information, including password-protecting all Gartner-issued devices and applications on which a Gartner employee may access Gartner's confidential information. *Id.* ¶ 15.

1.      **Faramo's Employment Agreement with Gartner.**

On March 4, 2022, Faramo entered into the "Agreement Regarding Certain Conditions of Employment" (the "Faramo Agreement") that protects Gartner's trade secrets, proprietary and confidential information, and customer and employee relationships.  Whedbee-Pluscec Decl., Ex. 3, ¶¶ 6-7; Faramo Agmt., Ex. 3A.  Faramo signed the Faramo Agreement in connection with a grant of Restricted Stock Units ("RSUs").  Whedbee-Pluscec Decl., Ex. 3, ¶ 7.

The Faramo Agreement contains reasonable and limited post-employment confidentiality and non-disclosure, non-competition, and non-solicitation provisions.[1]  The confidentiality and non-disclosure provisions prohibit Faramo from using or disclosing Gartner's or its clients' "Confidential Information" other than solely in the furtherance of Gartner's business.  Faramo Agmt., Ex. 3A, ¶ 1.(b).  The Faramo Agreement defines "Confidential Information" as:

> (i) financial information, (ii) products, (iii) product and services costs, prices, profits and sales, (iv) forecasts, (v) computer programs, (vi) databases (and the documentation and information contained therein), (vii) computer access codes and similar information, (viii) software ideas, (ix) know-how, technologies, concepts and designs, (x) research projects and all information connected with research and development efforts, (xi) records, (xii) business relationships, methods and recommendations, (xiii) client lists (including identities of clients and prospective clients, identities of individual contracts at business entities which are clients or prospective clients, client spending, preferences, business or habits), (xiv) subscription or consultant termination dates, (xv) personnel files, (xvi) competitive analyses, and (xvii) other confidential or proprietary information that has not been made available to the general public by the Company's senior management, and (xviii) non-public information provided to the Company by its clients [as well as] all information related to the operation of the Company's business, including, without limitation, knowledge of the Company's assets referenced above and other tangible or intangible assets and other information obtained by Employee in the course of employment (collectively, the "Company's Property") . . . .

*Id.*, ¶ 1.(a).

The Faramo Agreement's non-competition provision provides, in pertinent part:

---

[1]      In signing the Faramo Agreement, Faramo acknowledged that "the time, geographic and scope limitations of these obligations are fair and reasonable in all respects, and that [he] will not be precluded from gainful employment if [he] is obligated to comply with the [confidentiality and non-disclosure, non-competition, and non-solicitation] provisions of the Agreement."  Faramo Agreement, Ex. 3A, ¶ 6.(f).

Employee agrees that, for a period of one (1) year following the termination of his or her Employment with the Company, for any reason whatsoever, Employee will not, on his or her own behalf or on behalf of any other person or entity (whether as a consultant, analyst, sales person, independent contractor, independent business venturer, partner, member, employee or otherwise), directly or indirectly:

(i) Engage in any Competitive Acts; and/or

(ii) Entice, encourage, cause or invite any of the Company's clients, prospects, or vendors to discontinue or diminish their business with the Company, or otherwise interfere with or adversely modify their relationships with the Company. Paragraph 6(b)(ii) is limited to clients, prospects, or vendors with whom Employee had contact, managed, or became aware of at any time during the Employment.

*Id.*, ¶ 6.(b).  The Faramo Agreement defines "Competitive Acts" as:

(A) the development, production, marketing or selling of (or assisting others to develop, produce, market or sell): (x) syndicated research that competes with Gartner or its subsidiaries; or (y) a product or service which is competitive with the existing or planned products or services of the Company with which Employee was involved in or managed at any time during the last twenty-four (24) months of the Employment; and/or (B) the direct or indirect provision of services to, or solicitation of, the Company's clients or known prospects with whom Employee had contact, managed, or became aware of as a result of being employed by the Company, for the purposes of developing, producing, marketing or selling such competitive products or services.

*Id.*, ¶ 6.(a)(i).[2]

By signing the Faramo Agreement, Faramo agreed that all information related to the operation of Gartner's business he obtained in the course of his employment constitutes confidential, trade secrets of Gartner and shall remain the property and trade secrets of Gartner. *Id.*, ¶ 1.(a).  Faramo acknowledged that any disclosure of Gartner's Confidential Information would cause "irreparable and continuing damage to [Gartner], for which money damages would not provide adequate relief." *Id.*, ¶ 9.  Faramo agreed that if he violated the Faramo Agreement's

---

[2]    The Faramo Agreement also includes an employee non-solicitation provision that provides, in pertinent part: "Employee further agrees that, for a period of eighteen (18) months following the termination of his or her Employment with the Company, for any reason whatsoever, Employee will not, directly or indirectly solicit, entice, or recruit employees of the Company to leave its employ, or offer or cause to be offered employment to any person who was employed by the Company at any time during the twelve (12) months prior to the termination of Employee's employment with the Company." Faramo Agmt., Ex. 3A, ¶ 6.(c).

terms, Gartner would be entitled to "immediate, temporary, preliminary and permanent injunctive relief ... in order to prevent the continuation of such irreparable harm to [Gartner] and to enforce the terms of this Agreement." *Id.*, ¶ 9.(a). Faramo further agreed to a tolling provision, providing that in the event of a breach—or good faith allegation of a breach—of the restrictive covenants, "the restricted periods set forth in this [agreement] shall be tolled until such breach or violation, or allegation thereof, has been duly cured or resolved, as applicable." *Id.*, ¶ 6.(f).

**2.    Faramo's Pre-Resignation Misconduct and Employment with Hackett.**

On or about February 22, 2023 Hackett sent Faramo an offer letter to his Gartner email address. Offer Ltr., Ex. 4. Hackett offered Faramo a high six-figure salary, incentive compensation opportunities, and significant equity awards. *Id.*

Faramo tendered his resignation to Gartner on March 6, 2023, and his last day of employment was March 17, 2023. Whedbee-Pluscec Decl., Ex. 3, ¶ 17. Upon his resignation, Faramo refused to disclose the identity of his new employer and refused to engage with Gartner's legal team regarding his future employment. *Id.*, ¶ 18.

In the month leading up to his last day of employment, including after Faramo received his Hackett offer letter, Faramo sent a number of internal Gartner documents containing confidential and trade secret information to his personal email address. These documents included the following information:

      a.  a grid outlining Gartner's competencies used to measure sales success, which can be used to build an identical framework for a competitor;

      b.  information regarding Gartner's sales training programs, some of which are marked "RESTRICTED DISTRIBUTION";

      c.  charts documenting Gartner's "levers to increase growth" and internal commentary regarding Gartner growth metrics;

      d.  Gartner's internal research regarding Chief Sales Officer success;

e.  Gartner intellectual property (including slide decks and talking points) created for customers who subscribe to Gartner's Chief Sales Officer Research and Advisory services, which are explicitly marked "RESTRICTED DISTRIBUTION"; and

f.  Gartner intellectual property (including slide decks and notes) documenting Gartner's proprietary process and methodology to drive clients and prospects toward certain topics and issues to increase demand for Gartner's products and services, which are explicitly marked "RESTRICTED DISTRIBUTION" and "NOT FOR EXTERNAL DISTRIBUTION."

Whedbee-Pluscec Decl., Ex. 3, ¶ 20; Emails, Ex. 3C.  Faramo sent the charts documenting Gartner's "levers to increase growth" to his personal email address after he provided his resignation notice to Gartner.  Emails, Ex. 3C.  Others were sent after Faramo received his Hackett Offer Letter.  *Id.* All of these documents constitute "Confidential Information" as defined by the Faramo Agreement.  *Id.*

Hackett hired Faramo as its Senior Vice President, Global IPB sales.  Krug Decl., ¶ 31. In this role, Faramo inevitably will draw from his nearly twenty-years of Gartner experience.  Faramo will utilize his experience in nearly all aspects of Gartner's sales divisions to target the same clients he interfaced with at Gartner.  *Id.* Faramo will help Hackett implement its new "go to market strategies" and "transformative business plan," as discussed below.  *See* Section II.D, *infra*. Faramo has exactly the type of "sales expertise" Hackett was determined to find and leverage to its advantage. *See* Section II.C.2; Section II.D, *infra*.

## C.    Van Decker's Employment with Gartner.

Starting in 2006, Van Decker served as a Vice President, Analyst for Gartner.  Miller Decl., Ex. 2, ¶ 10.  In this role, Van Decker served as a contributor and thought leader within Gartner's Research and Advisory organization, providing expert guidance and assistance to various leaders throughout his tenure to enable faster, smarter decisions and stronger performance on their organizations' most critical priorities.  *Id.*, ¶ 11.

Van Decker primarily worked in Gartner's Finance Apps and ERP segments.  Miller Decl., Ex. 2, ¶ 12.  Van Decker gained expertise in these segments by: (i) utilizing Gartner's Secondary Research Services to identify vendors in each market; (ii) arranging and attending vendor briefings with selected vendors in each market; and (iii) gathering knowledge from his direct peers and those who reported to him, including colleagues in Gartner Consulting and other Gartner business units who know these markets on a deeper level.  *Id.*, ¶ 14.

Based on his expertise in these segments, Van Decker anchored Gartner's coverage of these markets.  Miller Decl., Ex. 2, ¶ 15.  Through his employment with Gartner, Van Decker developed well-established and strong relationships with the various vendors in this space, which allowed Van Decker to develop a deep understanding of the markets, the businesses operating within them, the priorities and needs of these businesses, and how to establish the kind of meaningful and trusting relationships with these businesses that resulted in demand for Gartner products and services.  *Id.*  Given this deep understanding, Van Decker contributed to and was provided access to Gartner's proprietary research and MQs in the Finance Apps and ERP segments.  *Id.*, ¶ 19.

Van Decker also gained intimate knowledge of Gartner's clients by conducting, developing, and reviewing research via client, vendor, and analyst networking, as well as evaluating and analyzing information and participating in research meetings and other activities.  Miller Decl., Ex. 2, ¶ 20.  This analysis and interfacing provided Van Decker with a keen understanding of clients' vendor experiences and, in turn, the clients' expectations and needs.  *Id.*

In the last approximately five months prior to his resignation, Van Decker also worked in Gartner's TSP segment.  Miller Decl., Ex. 2, ¶ 16.  In this role, Van Decker expanded his knowledge of Gartner's clients, relationships with clients and vendors, and Gartner's targeted

research in this segment.  *Id.*, ¶ 18.  For this reason, Gartner required Van Decker to attend and successfully complete Gartner's Data Protection Training.  *Id*.

       1.      **Van Decker's Employment Agreement with Gartner.**

On March 4, 2022, Van Decker entered into the "Agreement Regarding Certain Conditions of Employment" (the "Van Decker Agreement") intended to protect Gartner's trade secrets, proprietary and confidential information, and customer and employee relationships.  Van Decker Agmt., Ex. 3B.  Van Decker signed the Van Decker Agreement in connection with his transfer to TSP, which came with a pay raise and increased bonus.  Whedbee-Pluscec Decl., Ex. 3, ¶¶ 8-9.

The Van Decker Agreement contains the same reasonable and limited post-employment confidentiality and non-disclosure, non-competition, and non-solicitation provisions as the Faramo Agreement.[3]  Van Decker Agmt., Ex. 3B, ¶¶ 1, 6; Faramo Agmt., Ex. 3A, ¶¶ 1, 6.  Specifically, the confidentiality and non-disclosure provisions of the Van Decker Agreement prohibit Van Decker from using or disclosing Gartner's or its clients' "Confidential Information" other than solely in the furtherance of Gartner's business and further prohibit Van Decker from taking any actions that would constitute or facilitate the unauthorized use or disclosure of Confidential Information.  Van Decker Agmt., Ex. 3B, ¶ 1.(b).  The Van Decker Agreement's "Non-Disclosure" provisions contain the same definition of "Confidential Information" as is found in the Faramo Agreement.  *Id.,* ¶ 1.(a); Faramo Agmt., Ex. 3A, ¶ 1.(a).  The Van Decker Agreement also contains the same one year "Non-Competition" provision and definition of "Competitive Acts"  that are found in the Faramo Agreement.  Van Decker Agmt., Ex. 3B, ¶¶ 6.(a)(i); 6.(b); Faramo Agmt.,

---

[3]      In signing the Van Decker Agreement, Van Decker acknowledged that "the time, geographic and scope limitations of these obligations are fair and reasonable in all respects, and that [he] will not be precluded from gainful employment if [he] is obligated to comply with the [confidentiality and non-disclosure, non-competition, and non-solicitation] provisions of the Agreement."  Van Decker Agmt., Ex. 3B, ¶ 6.(f).

Ex. 3A, ¶ 6.(a)(i).[4]

Like Faramo, Van Decker agreed that all information related to the operation of Gartner's business constitutes confidential, trade secrets of Gartner.  Van Decker Agmt., Ex. 3B, ¶ 1.(a). Van Decker agreed to the same acknowledgment of irreparable harm and consent to an injunction. *Id.*, ¶ 9, 9(a).  And, like Faramo, Van Decker agreed to a tolling provision.  *Id.*, ¶ 6.(f).

### 2.    Van Decker's Resignation from Gartner and Employment with Hackett.

Van Decker resigned from Gartner in July 2022.  Whedbee-Pluscec Decl., Ex. 3, ¶ 21.  He joined Hackett as its Chief of Research in February 2023.  Miller Decl., Ex. 2, ¶ 22.  In this role, Van Decker can use Gartner confidential and proprietary information to develop Hackett's own competitive products, tools, and services that can be marketed in competition with Gartner.  Miller Decl., Ex. 2, ¶ 25.  Indeed, as detailed in Section II.C. above, Van Decker has a deep understanding of what clients in various business sectors are looking for in terms of market intelligence and subscription-based research, and has deep relationships with clients and vendors that he can translate to Hackett.  *Id.*, ¶ 23.  And that is exactly what Van Decker is doing for Hackett, which has gone so far as to advertise that Van Decker "sets the vision for the research program at the Hackett Group," and touts that in his career as "a leading ERP and financial management IT industry analyst," he "has worked with thousands of customers concerning their IT and business strategies."[5]

Van Decker has already hosted a podcast on behalf of Hackett specifically focused on research resulting from Enterprise Key Issues facing executive management in finance and

---

[4]       The Van Decker Agreement also contains the same employee non-solicitation provision as is found in the Faramo Agreement.  Van Decker Agmt., Ex. 3B, ¶ 6.(c); Faramo Agmt., Ex. 3A, ¶ 6.(c).

[5]       *See*  https://pages.awscloud.com/rs/112-TZM-766/images/Hackett_Business-impact-of-cloud-adoption-for-industrial-manufacturers.pdf?sc_channel=cfm-blog&sc_campaign=maximizing-business-impact-of-cloud-adoption-for-industrial-manufacturers&sc_medium=cfm&sc_content=cfm-blog&sc_detail=link&sc_outcome=aw&sc_publisher=cfm-awareness&trk=maximizing-business-impact-of-cloud-adoption-for-industrial-manufacturers_cfm-blog_link (last accessed on May 18, 2023).

information technology, as well as their "strategic priorities for 2023."[6]  This is precisely the kind of expertise Van Decker acquired, and became knowledgeable about, during his Gartner tenure. Hackett is capitalizing on Van Decker's Gartner experience to gain more clients and exposure to implement its go-forward business plan.

**D.    Hackett's Business and Its New Plan for Directly Competing with Gartner.**

Similar to Gartner on many levels, Hackett offers services including benchmarking, executive advisory, IPaaS, market intelligence, business transformation and cloud enterprise application implementation.[7]  Indeed, Hackett is a direct Gartner competitor. Krug Decl., Ex. 1, ¶ 28. Just this year, Hackett launched its "Hackett Connect" platform, which supports its executive and market intelligence offerings, including its syndicated research channel relationships. Hackett Connect manages Hackett's "leading market intelligence research programs for executives and software and services providers."[8]  Per its 2022 Annual Report, Hackett has changed "the way [it] go[es] to market and engage[s] clients, as well as added software implementation and market intelligence offerings and partners" as part of "reposition[ing] [its] offerings to the emerging digital transformation opportunities."  Hackett Ann. Rep. at pp. 4-5 (relevant pages attached as Ex. 5).

Hackett has a "Market Intelligence" segment where its "independent research on software and service providers supplies executives with intelligence that quantifies business value to make better informed purchasing decisions."[9]  Just this year, Hackett launched its "Hackett Connect" platform, which supports its executive and market intelligence offerings, including its syndicated

---

[6]    *See* https://www.thehackettgroup.com/podcast/2023-enterprise-key-issues-research/ (last accessed on May 18, 2023).

[7]    *See* https://www.thehackettgroup.com/about/ and https://www.thehackettgroup.com/business-transformation-hackett/ (last accessed on June 2, 2023).

[8]    *See* https://www.thehackettgroup.com/about/ (last accessed on May 8, 2023).

[9]    *See* https://www.thehackettgroup.com/about/ (last accessed on May 8, 2023).

research channel relationships. Hackett Connect manages Hackett's "leading market intelligence research programs for executives and software and services providers."[10]

As part of its "transformative business plan," Hackett is "expand[ing] executive research and advisory and market intelligence programs and dedicated sales expertise to grow high margin annualized recurring revenues." Hackett Ann. Rep., Ex. 5, at p. 4. Hackett's investment in its syndicated research development and market intelligence offerings is a primary focus for Hackett in 2023. In its February 21, 2023 Q4 2022 Earnings Call, Hackett's CFO stated: "[T]the first quarter of 2023 will reflect the incremental investment we are making in program development and add the dedicated sales resources for benchmarking, IPaaS, Executive Advisory Market Intelligence and our other IP service offerings." Earnings Call Trans., Ex. 6, at p. 7.

In light of Hackett's new strategic direction and focus on syndicated research and market intelligence offerings, it has targeted Gartner employees, like Faramo, Van Decker, and others, to join Hackett in order to unfairly capitalize on the specialized training and unique knowledge Gartner provides its employees. Hackett's CEO has acknowledged Hackett's "aggressive sales hiring" that would allow it "to continue to grow our higher-margin recurring revenues and related annual contract value during 2023." Earnings Call Trans., Ex. 6, at , p. 5. Hackett's CEO added further context regarding Hackett's "aggressive sales hiring," stating: "[T]he prospects for us to continue to grow our Research Advisory IPaaS offerings and new market intelligence programs is significant. We think that the biggest thing that we lack is a world-class sales group. We're adding both senior and entry and mid-level people to our team. We'll continue to do that throughout the year." *Id.*, p. 11.

In line with this "aggressive sales hiring," a Hackett recruiter reached out to a high-level

---

[10]    *See* https://www.thehackettgroup.com/about/ (last accessed on May 8, 2023).

Gartner Sales Leader, who is still employed by Gartner, seeking a "Market Intelligence Sales Leader/Partner" with "Magic Quadrant" experience selling to "vendor executives" who would be "responsible for developing a sales team to support a 'start-up practice' focused on selling high value membership to solution providers." Krug Decl., Ex. 1, ¶ 29. The recruiter stated that Hackett's CEO "created" the role due to Hackett's growth in this area and that "the business plan for the Market Intelligence practice is to develop a dedicated team that [Hackett] believe[s] will be an industry paradigm-changing solution provider comparison analytical tool." *Id.* In other words, Hackett was looking for a sales leader familiar with Gartner-branded products and services to develop a team to do exactly what Gartner does. Hackett reached out to multiple Gartner leaders to fill this role, ultimately landing on Faramo. Krug Decl., Ex. 1, ¶¶ 29-31.

Hackett is arming itself with Gartner's "bench" of business developers in order to reposition itself in the market and push its syndicated research and market intelligence offerings. Hackett is also capitalizing upon Gartner's premier industry ranking—specifically by poaching Gartner's employees like Faramo and Van Decker—to increase its visibility in the industry.

With Hackett's focus on its "aggressive sales hiring," Hackett is arming itself to unfairly steal Gartner's market share on a truly global level. Coupled with Van Decker's expertise, deep knowledge of Gartner's products and offerings, and vendor relationships, Hackett is primed to unfairly compete with Gartner. Faramo's multi-faceted expertise in different segments enables Hackett to exploit Gartner's GTS and GBS sales channels, sales methodologies, and client relationships, all developed at Gartner's considerable time and expense. Hackett will be able to capitalize on Faramo's knowledge of how Gartner's GTS and GBS segments work in tandem to reach a broad swath of enterprises, which will erode Gartner's competitive edge.

**E.    Gartner's Post-Employment Correspondence with Faramo and Van Decker.**

On April 6, 2023, Gartner's counsel sent the Individual Defendants separate letters dated

April 7, 2023 regarding their post-employment contractual obligations to Gartner and seeking specific assurances related to those obligations. Ltr. to Faramo, Ex. 7; Ltr. to Van Decker, Ex. 8. Gartner also asked for information regarding their roles with Hackett in order to understand whether their employment with Hackett breached their employment agreements with Gartner and/or put Gartner's confidential and trade secret information at risk. Exs. 7-8. Gartner's counsel also sent a copy of these letters to Hackett, both of which included a copy of the Individual Defendants' employment agreements. Email to Hackett, Ex. 9.

In response to these letters, Defendants' counsel refused to provide *any* information to Gartner. Response Ltr., Ex. 10. Neither Hackett, Faramo, nor Van Decker provided Gartner with any requested assurances that their employment with Hackett was not competitive with their roles with Gartner or that Hackett had taken any steps to ensure protection of Gartner's confidential and trade secret information. *Id.* Instead, incredibly, Hackett accused Gartner of improperly attempting to obtain ***Hackett's*** trade secret information by virtue of these requests. *Id.*

After receiving Defendants' response, Gartner's counsel engaged in several attempts to work with Hackett to address Gartner's concerns and avoid escalating the situation, including a call with Defendants' counsel on April 26, 2023 during which Gartner's counsel explained that Gartner was looking for high-level information regarding the Individual Defendants' duties and other assurances in an effort to better understand their roles. After receiving no further response or assurances from Defendants, Gartner's counsel again contacted Defendants' counsel about the status of the requested information. May 4, 2023 Email Chain, Ex. 11. Defendants' counsel responded that same day, once again refusing to provide *any* of the requested information or assurances. *Id.*

Defendants' failure to provide the requested assurances or show even a modicum of

cooperation with Gartner's requests has necessitated the filing of this lawsuit and motion seeking preliminary injunctive relief.

### III.    GARTNER IS ENTITLED TO A PRELIMINARY INJUNCTION

In order to obtain a preliminary injunction, Gartner must establish "that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Onward Search LLC v. Noble,* No. 3:22-cv-00369 (VAB), 2022 WL 2669520, at *8 (D. Conn. July 11, 2022) (citing *Glossip v. Gross*, 576 U.S. 863, 876 (2015)).  Gartner is entitled to preliminary injunctive relief against Defendants because it satisfies each of the requisite factors—a fact that the record evidence from both expedited discovery and the preliminary injunction hearing will confirm.

### A.    Gartner Has A Strong Likelihood Of Success On The Merits.

Gartner has established that the Individual Defendants breached and will continue to breach their employment agreements by virtue of their work for Hackett.  Gartner will also likely succeed on its threatened misappropriation of trade secrets claims under the Connecticut Uniform Trade Secrets Act ("CUTSA") and the Defend Trade Secrets Act ("DTSA").  Finally, Gartner will likely succeed on the merits of its tortious interference with contract claim against Hackett.

### 1.    Gartner is Likely to Succeed on the Merits of its Breach of Contract Claims.

The Individual Defendants unquestionably breached and will continue to breach their employment agreements, which are valid and enforceable contracts.  The essential elements of a breach of contract claim are: (1) the formation of an agreement; (2) performance by one party; (3) breach of the agreement by the other party; and (4) damages.  *CCT Comms., Inc. v. Zone Telecom, Inc.*, 327 Conn. 114, 133, 172 A.3d 1228 (2017).  Gartner satisfies all four elements here.

### a.    The Agreements Are Valid and Enforceable Contracts.

There is no dispute that the Individual Defendants agreed to and executed their respective employment agreements on March 4, 2022.  The terms of their employment agreements, including the restrictive covenants therein, represent a valid and enforceable contract.

Connecticut courts will uphold restrictive covenants so long as (i) sufficient consideration supports the restrictions and (ii) the covenants contain reasonable restraints.  *Americus Dental Labs, Inc. v. Pincheira*, No. 3:05CV1208(RNC), 2006 U.S. Dist. LEXIS 109301, at *15–25 (D. Conn. Mar. 3, 2006); *3M v. Francavilla*, 191 F. Supp. 2d 270, 278–80 (D. Conn. 2002).  Gartner clears both hurdles.

### (i)    The Non-Competition Covenants in the Agreements are Supported by Adequate Consideration.

Adequate consideration supports the restrictive covenants in the Individual Defendants' employment agreements.  In exchange for entering into the Faramo Agreement, Gartner provided Faramo with RSUs and access to and actual provision of confidential and proprietary information, as described herein.  *See* Sections II.B. and II.B.1., *supra*.  In exchange for entering into the Van Decker Agreement, Gartner provided Van Decker with compensation increases and access to and actual provision of confidential and proprietary information, as described herein.  *See* Sections II.C. and II.C.1., *supra*.  These benefits constitute adequate consideration to support a restrictive covenant under Connecticut law.  *See, e.g., A.H. Harris & Sons, Inc. v. Naso*, 94 F. Supp. 3d 280, 292-93 (D. Conn. 2015) (finding a salary increase and a promotion was adequate consideration); *see also Osborne v. Locke Steel Chain Co.*, 153 Conn. 527, 528-33, 218 A.2d 526 (1966) (a mere bargained benefit to the employee and detriment to the plaintiff is considered sufficient consideration).

**(ii)    The Non-Competition Covenants are Reasonable and Necessary to Protect Gartner's Legitimate Business Interests.**

The Faramo Agreement and Van Decker Agreement satisfy Connecticut's reasonableness requirements.  Under Connecticut law, "[a] covenant that restricts the activities of an employee following the termination of his employment is valid and enforceable if the restraint is reasonable." *New Haven Tobacco Co. v. Perrelli*, 18 Conn. App. 531, 533, 559 A.2d 715 (1989) (quoting *Scott v. General Iron & Welding Co.*, 171 Conn. 132, 137, 368 A.2d 111 (1976)).  In determining whether a covenant is reasonable, courts consider: "(1) the length of time the restriction operates; (2) the geographical area covered; (3) the fairness of the protection accorded to the employer; (4) the extent of the restraint on the employee's opportunity to pursue his occupation; and (5) the extent of interference with the public's interests."  *United Rentals, Inc. v. Frey*, CIV. No. 3:10CV1628 (HBF), 2011 WL 693013, at *6 (D. Conn. Feb. 17, 2011) (citation omitted).

The non-compete obligations in the Individual Defendants' employment agreements are reasonably related to the protection of Gartner's legitimate business interests.  The Individual Defendants had unfettered access to a wide array of proprietary information.  For example, Faramo had access to confidential and trade secret information relating to Gartner's product and service offerings, strategic discussions regarding the future of Gartner's products, the identities of Gartner's client and prospective clients, client and prospects priorities, pricing and structure of products and services, go-to-market strategies for various Gartner solutions, and how to best position the appropriate Gartner solutions against any competitive offerings.    *See* Section II.B., *supra*.  Faramo was also familiar with how to drive demand for Gartner offerings to obtain new business.. *Id.*

Van Decker had access to confidential and trade secret information relating to vendors and customers in the Finance Apps and ERP segments, the businesses operating in these segments, the

priorities and needs of these businesses, proprietary research and MQs for these segments, and how to establish meaningful and trusting relationships with these businesses that resulted in demand for Gartner products and services.  *See* Section II.C., *supra*.  Van Decker has a keen understanding of clients' vendor experiences and, in turn, the clients' expectations and needs that enabled him to tap into Gartner's specialized consumer base. *Id*.  Van Decker was also provided with targeted research relating to the TSP segment.  *Id.*

Protecting this information constitutes a legitimate interest under Connecticut law.  *See, e.g., Applied Advert. v. Jacobs*, No. HHDCV156059689S, 2020 Conn. Super. LEXIS 584, \*30–37 (Super. Ct. May 20, 2020); *Advanced Arm Dynamics of New Eng. LLC v. Comprehensive Prosthetic Servs. LLC*, No. CV 06-5004605S, 2011 Conn. Super. LEXIS 182, \*61–62 (Super. Ct. Feb. 23, 2011).  Because this information gives the Individual Defendants the precise tools and information to help Hackett unfairly compete with Gartner, the non-competition provisions are unquestionably necessary to protect Gartner's legitimate business interests.  *See, e.g.*, *Weiss v. Wiederlight*, 208 Conn. 525, 533, 546 A.2d 216 (1988).  Further, it is well-settled in Connecticut that long-term customer relationships constitute protectable interests justifying enforcement of a non-compete.  *Id.*

### 1).    The Temporal and Geographic Limits Are Fair and Reasonable Given Faramo's and Van Decker's Knowledge and the Global Nature of Gartner's Business.

The twelve-month temporal limitation of the Individual Defendants' non-compete covenants is presumptively enforceable under Connecticut law, as Connecticut courts regularly uphold a one-year time restriction.  *See Frey*, 2011 WL 693013, at \*6; *Weseley Software Dev. Corp. v. Burdette*, 977 F. Supp. 137, 144 (D. Conn. Dec. 30, 1996).  A twelve-month temporal limitation is manifestly reasonable considering the Individual Defendants' high-level roles and access to Gartner's most sensitive confidential information that does not have a brief "shelf-life."

The lack of a geographic restriction in the Individual Defendants' non-compete covenants does not render the agreements unreasonable. Gartner conducts business throughout the United States and globally. In their positions at Hackett, the Individual Defendants will undoubtedly compete with Gartner throughout the United States and globally—*i.e.*, the exact same territory. As such, the lack of a geographic restriction is reasonable. *See Friese v. Fadner Media Enters., LLC*, No. FSTCV146021437, 2017 Conn. Super. LEXIS 126, *19 (Super. Ct. Jan. 18, 2017) ("[T]he law has come to acknowledge the inapplicability of geographic bounds to companies that do business on a national or international basis . . .," and collecting Connecticut cases). Further, the Individual Defendants expressly agreed that, due to the global nature of Gartner's business, "the absence of [a territorial] limitation is entirely reasonable under the circumstances." Faramo Agmt., Ex. 3A, ¶ 6.(a)(ii); Van Decker Agmt., Ex. 3B, ¶ 6.(a)(ii).

### 2). The Agreements Do Not Restrain the Individual Defendants From Earning a Living and Are Consistent with the Public's Interest.

Connecticut courts routinely enforce covenants not to compete where, as here, the covenant is narrowly tailored so as not to preclude defendants from earning a living. *See United Rentals, Inc. v. Bastanzi*, No. 3:05CV596 (RNC), 2005 U.S. Dist. LEXIS 45268, at *23–24 (D. Conn. Dec. 22, 2005) ("[Although] [b]y its very nature, the restrictive covenant affects the defendant's opportunity to pursue his occupation[,] [the Agreement] does not do so unreasonably."). The covenants not to compete extend only to the development, marketing and selling of competitive products and/or the provision of services to, or solicitation of, Gartner's clients or prospective clients learned of while employed by Gartner. The covenants permit the Individual Defendants to pursue myriad other employment opportunities during the restriction period. Faramo may work in a sales role for countless other enterprises and Van Decker may pursue employment in a consulting role and/or a competitive intelligence, analyst relations or product

management/marketing role with a technology vendor.  Accordingly, the Individual Defendants'

employment agreements are enforceable under Connecticut law.  *See Bastanzi*, 2005 U.S. Dist.

LEXIS 45268, at *23–24 (finding a covenant not to compete does not deprive the defendant of the

ability to earn a living where the defendant is permitted to work anywhere except in competition

with the plaintiff within the restricted geographical area for a limited time period).

 While there is a public interest in workplace mobility, the "public interest favors the

enforcement of reasonably written restrictive covenants," as is the case here.  *Entegee, Inc. v.

Korwek*, No. 15-cv-1087 (VLB), 2015 WL 5202902, at *17 (D. Conn. Sept. 4, 2015).  And the

public interest favors the protection of trade secret and confidential information developed by a

company at significant expense, as is the case here.  *DeLeo v. Equale & Cirone, LLP*, 202 Conn.

App. 650, 659–77, 246 A.3d 988 (2021).

> ### b.     Gartner Satisfies the Remaining Elements of its Breach of Contract Claim.

Gartner performed its obligations under the Individual Defendants' employment

agreements in employing Faramo and Van Decker and providing compensation and benefits for

their services.  On the other hand, the Individual Defendants have materially breached, and

continue to materially breach, their respective employment agreements.

In their roles at Hackett, there is no question that the Individual Defendants have—or

will—engage in the development, production, marketing, or selling of "(x) syndicated research

that competes with Gartner or its subsidiaries; or (y) a product or service which is competitive with

the existing or planned products or services of [Gartner]," which is expressly prohibited under the

Individual Defendants' employment agreements.  Faramo Agmt., Ex. 3A, ¶ 6.(a)(ii); Van Decker

Agmt., Ex. 3B, ¶ 6.(a)(ii).  Hackett is Gartner's direct competitor, as both companies provide the

same services and compete for the same clients to provide the same services with regard to

"syndicated research" and "market intelligence."  Hackett's purpose in hiring the Individual Defendants was to implement its new transformative business plan aimed at expanding its syndicated research and marketing intelligence business in direct competition with Gartner.  *See* Section II.D., *supra*.

Defendants have refused to confirm that the Individual Defendants have taken non-competitive roles at Hackett.  *See* Section II.E., *supra*.  Defendants' silence speaks volumes.  Based on the highly competitive nature of Gartner and Hackett, the significant similarities in the offerings they provide to the exact same type of customers, and the critical duties the Individual Defendants performed for Gartner, it is only reasonable to believe they are joining Hackett in roles that are substantially similar to the ones they held at Gartner.  *See* Sections II.B., II.C. and II.E., *supra*.  That is the reason for joining a direct competitor.

Additionally, in the days following his resignation, but before he officially departed Gartner, Faramo stole information regarding Gartner's sales training programs and its proprietary processes and methodologies to drive demand for Gartner's products.  *See* Section II.B.2., *supra*.  This information is highly competitive and sensitive.  Faramo presumably had no legitimate reason to access this information other than to obtain information to help him compete with Gartner as a sales leader for Hackett.[11]  Since joining Hackett, Van Decker has already hosted a podcast on behalf of Hackett addressing research from key issues facing executive management in finance, HR, information technology, procurement, supply chain and global business services.  *See* Section II.C.2., *supra*.  This is precisely the kind of expertise Van Decker acquired solely by virtue of his longstanding Gartner tenure, and it is the type of expertise that will allow Van Decker to aid in

---

[11]    In further breach of their employment agreements, the Individual Defendants are inevitably using or disclosing Gartner "Confidential Information," including Gartner trade secrets, in their positions at Hackett in violation of the non-disclosure provisions of their agreements.  *See* Sections II.B., II.C. and II.E., *infra*.

Hackett's competition with Gartner. *Id.*; Section II.C. It is clear the Individual Defendants' roles at Hackett are substantially similar, if not identical, to their former roles at Gartner, and they are developing, marketing, and/or selling products or services that are competitive with those of Gartner. Were they doing otherwise, the Individual Defendants would have no need to refuse Gartner's requests and maintain strict secrecy about their roles.

The Individual Defendants have breached their obligations under the Agreements and will continue to do so by performing substantially similar job duties and responsibilities with Hackett, and by necessarily using Gartner's confidential information and trade secrets. The Individual Defendants' competition in violation of their non-competition agreements and use and disclosure of Gartner's confidential information has, and will continue to, damage Gartner through, among other things, diminishing the value of the confidential information, harming Gartner's relationships with its customers and employees, and damaging Gartner's goodwill, reputation, and competitive advantage. Accordingly, Gartner has demonstrated a substantial likelihood of success on the merits of its breach of contract claim. *See ATI Eng'g Servs., LLC v. Millard*, No. NNHCV186079777S, 2018 Conn. Super. LEXIS 3630, at *43–53, 73–83 (Super. Ct. Aug. 7, 2018) (finding employer satisfied its burden in showing likelihood of success on the merits of a breach of contract claim where a former employee is employed with a competitor in a similar position to the one he held in violation of an agreement).

### 2. Gartner Is Likely to Succeed on the Merits of Its Misappropriation of Trade Secrets Claims Against Faramo and Van Decker.

As a threshold matter, Faramo committed *actual misappropriation* when he sent himself volumes of Gartner proprietary documents on the eve of his resignation. *See* Section II.B.2., *supra*. But there is threatened misappropriation too: by virtue of their roles at Hackett, both Faramo's and Van Decker's work threatens misappropriation of Gartner's trade secrets in violation of the

CUTSA and DTSA.  To establish trade secret misappropriation under the CUTSA, a plaintiff must prove that the information at issue is a trade secret and that the defendant misappropriated the trade secret.  *Elm City Cheese Co. v. Federico*, 251 Conn. 59, 69-70, 752 A.2d 1037 (1999).  The elements necessary to prove a violation of the CUTSA and DTSA are "largely the same."  *Sunbelt Rentals, Inc. v. McAndrews*, 552 F. Supp. 3d 319, 330 n.2 (D. Conn. Aug. 5, 2021).  Gartner is able to demonstrate a likelihood of success as to each of these elements because Faramo's and Van Decker's employment with Hackett creates a real and imminent threat of misappropriation.

>    **a.    Gartner's Pricing, Client Information, Products, Services, Business Plans and Strategies Constitute Trade Secrets.**

Gartner's client identities and related sensitive information, pricing strategies and models, business development plans and competitive strategies, curated and developed from client-centered metrics, data, and confidential information, constitute trade secrets under Connecticut and federal law.  Under the CUTSA and the DTSA, a trade secret is any:

> information, . . . pattern, compilation, program, device, method, technique, process, . . . cost data, or customer list that (1) [d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Conn. Gen. Stat. § 35-51(d); *see also* 18 U.S.C. § 1839(3) (same).

Connecticut courts consider the following factors to determine whether certain information is a trade secret: (1) the extent to which the information is known outside the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and its competition; (5) the amount of effort or money expended by the employer in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others; (7) the extent to which the employer-employee

relationship was a confidential or fiduciary one; (8) the method by which the employer acquired or compiled the information; and (9) the unfair advantage gained by the employee from using the employer's information. *Blue Cross & Blue Shield of Conn., Inc. v. DiMartino*, No. 30 06 42, 1991 Conn. Super. LEXIS 1570, at *9-*10 (Super. Ct. July 2, 1991) (citations omitted).

Gartner's Complaint establishes a likelihood of success on the merits of its misappropriation claims because its proprietary sales methodologies, past, present, and future product offerings, vendor relationships, customer identities and customer preferences, customer prospects, and strategic product forecasting are inherently valuable and constitute trade secrets under Connecticut and federal law.

As it relates to Faramo, he spent nearly twenty years in Gartner's various sales channels. He is intimately familiar with Gartner's proprietary sales methodologies across its different segments, including the sales "playbooks" for Account Executives and Business Developers. Faramo understands how these distinct Gartner roles, in addition to its GTS and GBS sales channels, work in tandem to tap into customer preferences and objectives and ultimately forge longstanding customer relationships. Faramo understands how Gartner drives demand for its products, and how it does it better than its competitors. Faramo is armed with the entirety of Gartner's sales success strategies, which can be duplicated and implemented for a competitor to obtain the same competitive edge as Gartner. On the eve of his resignation, Faramo went as far as to send himself "RESTRICTED" documents outlining these strategies and sales programs.

Aside from his deep knowledge of Gartner's proprietary sales methodologies, Faramo also had access to and knowledge of Gartner's existing and new product roadmap, including strategic future offerings, customer inquiries and emerging trends, and detailed customer feedback regarding Gartner's products. Faramo also participated in leadership discussions about these

issues. This information is not public; it is highly sensitive. Gartner compiles this information to successfully forecast new products and to identify where and how to create demand for Gartner products. And, again, Faramo sent himself "RESTRICTED" documents outlining some of these strategies shortly before resigning to join Hackett.

Faramo also had access to Gartner's "Org Base" and pipeline and forecast data, which includes a wealth of confidential information about each of Gartner's customers and prospects, including historical relationships with Gartner, current offerings, and details about prospective customers' ongoing negotiations with Gartner. Faramo also had access to his peers' sales forecast data by customer and/or prospect. In short, Faramo had intimate access not only to the most inner workings of Gartner's sales teams but also intimate knowledge of Gartner's future strategic planning across various business segments.

For his part, Van Decker, as a long-tenured and high-level Analyst, was an expert in Gartner's Finance Apps and ERP segments. Near the end of his employment, Van Decker moved into Gartner's TSP segment and further expanded his knowledge base of Gartner's research and advisory offerings, as well his relationships with key customers and vendors. In these roles, Van Decker was privy to Gartner's research planning agenda and, more specifically, the topics and markets Gartner would cover in a particular year.

Van Decker developed a deep understanding of these markets, the businesses operating in these markets, Gartner's customers and their priorities, and what types of research and advisory services are in high demand. Van Decker conducted his own research on customers and analyzed internal confidential information compiled about Gartner's customers through various briefings, research meetings, and other Gartner business units such as Gartner Consulting to understand Gartner's customers and their needs on a detailed level.

Of course, as a Vice President, Analyst, Van Decker had unfettered access to Gartner's proprietary research and research methodologies, and materially contributed to Gartner's research offerings. Van Decker's role also provided him access to Gartner's vendor briefings in these markets, which provide critical information regarding research trends and strategic product offerings.

Like Faramo, Van Decker is highly attuned to Gartner product and service offerings (past, present and future). He knows customer and prospect identities, client entitlements, pricing and structure of different products and services.

This information undoubtedly is valuable to Gartner's competitors, such as Hackett, as it enables them to tailor strategies to client-specific needs by unfairly tapping into Gartner's analyses of clients' historic practices, successes, failures, and even budgets. More specifically, Hackett, through Faramo's Gartner-specific expertise, will gain insights into the metrics underlying Gartner's sales methodologies and business development and pricing strategies. This will enable Hackett to shortcut the years and substantial resources Gartner invested to develop its unique products and services, curated and particularized pricing models, client lists, and growth strategies.

Gartner has taken various, reasonable measures to protect the confidentiality of its pricing, client information, and its overall product and service offerings (and the data from which they are derived), including password-protecting all Gartner-issued devices and applications on which a Gartner employee may access Gartner's confidential information. Gartner also protected the trade secrets to which Faramo and Van Decker had access by, among other things, requiring them to attend trainings and to affirm compliance with Gartner's Code of Conduct and other core policies, like Gartner's Data Protection Policy. This training outlines Gartner employees' data protection responsibilities and underscores the importance of protecting and safeguarding Gartner's

confidential information.  Much of the highly sensitive information that Faramo and Van Decker had access to is unavailable to other Gartner employees.  Gartner requires employees with access to its confidential information and trade secrets to execute agreements substantially similar to the Faramo Agreement and the Van Decker Agreement, both of which require employees to maintain the confidentiality of Gartner's "Confidential Information."  Gartner also required Faramo to attend and complete the GBS Ethical Selling Training Module and Affirmation as part of his GBS role and its provision of confidential information and trade secrets.  Whedbee-Pluscec Decl., Ex. 3, ¶ 13.

Such measures are reasonable under Connecticut law.  While "[t]here is not a single definition for what constitutes reasonable measures, [] courts have looked to physical security measures at facilities and confidentiality agreements relating to sensitive information in making their assessments."  *ML Fashion, LLC v. Nobelle GW, LLC*, No. 3:21-CV-00499, 2022 WL 313965, at *20 (D. Conn. Feb. 2, 2022) (citation omitted); *see also Avery Dennison Corp. v. Finkle*, No. CV010757706, 2002 WL 241284, at *3 (Conn. Super. Ct. Feb. 1, 2002) (employer took reasonable measures where it required employees to sign non-disclosure agreements and undergo yearly training regarding the protection of confidential information).

### b. Disclosure of Gartner's Trade Secrets is Threatened and Imminent.

Both the CUTSA and the DTSA permit injunctive relief in order to prevent actual and threatened misappropriation of trade secrets.  When evaluating whether the disclosure of trade secrets is inevitable, courts consider three factors: (1) whether the employers in question are direct competitors providing the same or similar services; (2) whether the employee's new position is nearly identical to his old one, such that he could not reasonably be expected to fulfill his new job responsibilities without utilizing the trade secrets of his former employer; and (3) whether the trade

secrets at issue are highly valuable to both employers. *Sunbelt*, 552 F. Supp. 3d at 331 (citations omitted).

Gartner satisfies the requisite elements to establish the inevitable disclosure and threatened misappropriation of its trade secrets. First, Gartner and Hackett are direct competitors, as both companies provide many of the same products and services and compete for the same clients to provide those services. Hackett has gone as far in recent months to actively announce its aggressive focus on the syndicated research and market intelligence space in which it will directly compete with Gartner. *See* Section II.D., *supra*.

Second, Hackett hired the Individual Defendants to function exactly as they did at Gartner. Hackett hired Faramo as its Senior Vice President, Global IPB sales so he could lean on the extensive proprietary information discussed above to enable Hackett to unfairly compete. Given the overlap between his position at Gartner and his new position at Hackett, it is unreasonable to assume that Faramo can fulfill his new job responsibilities without utilizing the trade secrets of Gartner. Nor should Faramo be given the benefit of the doubt. As evidenced by his conduct in sending numerous Gartner confidential documents to his personal email address after accepting his lucrative offer from Hackett, it is reasonable to assume that Faramo inevitably will use Gartner's trade secrets in his new position at Hackett. *See* Section II.B.; Section II.B.2, *supra*.

Similarly, Hackett hired Van Decker as its Chief of Research. Van Decker possesses exactly the type of information that Hackett wants to compete with Gartner and unfairly undermine Gartner's competitive advantage. Given the overlap between his position at Gartner and his new position at Hackett, it is unreasonable to assume that Van Decker can fulfill his new job responsibilities without utilizing the trade secrets of Gartner. Hackett has placed Van Decker in a

position that will require him to use Gartner's confidential information to "set[] the vision for the research program at the Hackett Group" as its Chief of Research.  *See* Section II.C.2., *supra*.

Third, the trade secret information in Faramo's and Van Decker's possession is highly valuable to both Gartner and Hackett.  Gartner dedicated substantial time and resources towards developing its proprietary sales methodology, business methods and operations, research products, techniques, strategies, client lists, relationships with vendors, compilations of sensitive and proprietary client information, and other trade secrets, all of which provide economic value and give Gartner an advantage over its competitors who have not compiled this information.  This information is not publicly known. This is exactly the type of information that Hackett can use to expand its syndicated research development and market intelligence offerings—which is a primary focus for Hackett in 2023 as part of its "Transformative Business Plan."  *See* Section II.D., *supra*. Hackett can use Gartner's hard work and information developed over years to "cut the line" and to erode Gartner's competitive edge by using Gartner's strategies and unfairly replicating its sales and research methodologies.  As such, this information is highly valuable to Hackett.

In situations such as this, courts within this district routinely grant preliminary injunctive relief in misappropriation cases predicated on the inevitable disclosure doctrine.  For example, in *Branson Ultrasonics Corp. v. Stratman*, this Court awarded the plaintiff former employer a preliminary injunction against its former employee who accepted employment with plaintiff's competitor. 921 F. Supp. 909 (D. Conn. Feb. 28, 1996).  The court considered that "[i]n the course of his employment at [plaintiff], [defendant] had access to and became familiar with confidential information . . . including the core . . . and [plaintiff's] plans for marketing." *Id.* at 912.  The court also acknowledged that while the employee's former and current roles were not identical, there existed "significant overlap" between them, and the employee would perform "substantially

similar" work in his new position. *Id.* In light of the overlap in roles, the court concluded the disclosure of trade secrets was inevitable, warranting preliminary injunctive relief. *Id.* at 912-13; *see also Groupon, Inc. v. Sung Shin,* 2022 WL 60526 at *6 (N.D. Ill. Jan. 6, 2022) ("Groupon has shown that Mr. Shin left Groupon for a substantially similar position with a competitor, and the disclosure of trade secrets . . . is inevitable"). Likewise, here, the Individual Defendants' roles at Hackett will lead to the imminent and inevitable disclosure of Gartner's trade secrets.

> **3.     Hackett Tortiously Interfered With the Individual Defendants' Employment Agreements with Gartner.**

Gartner is likely to succeed on its tortious interference with contractual relations claim, the elements of which are: "(1) the existence of a contractual or beneficial relationship; (2) the defendant's knowledge of that relationship; (3) the defendant's intent to interfere with the relationship; (4) the interference was tortious; and (5) a loss suffered by the plaintiff that was caused by the defendant's tortious conduct." *Landmark Inv. Grp., LLC v. CALCO Constr. & Dev. Co.*, 138 Conn. 847, 864 (2015) (citation omitted).

The Individual Defendants both signed valid and enforceable agreements with Gartner prohibiting them from competing with Gartner and from disclosing Gartner's trade secrets and confidential information. *See* Section III.A.1., *supra*. Hackett had both direct and constructive knowledge of the Individual Defendants' employment agreements and knew that employing them in their current roles would cause them to breach those agreements. Specifically, it is a regular practice in this industry for companies, like Gartner, to protect their interests through non-compete and non-disclosure agreements. Additionally, Gartner's counsel sent the Individual Defendants letters regarding their post-employment contractual obligations to Gartner, and separately sent a copy of these letters to Hackett, both of which included a copy of the Individual Defendants' employment agreements. As such, Hackett was aware of the restrictive covenants in the Individual

Defendants' employment agreements.  *See Companions & Homemakers, Inc. v. A&B Home Care Sols., LLC*, No. HHDCV176075627S, 2018 WL 1137546, at *1-3 (Conn. Super. Ct. Jan. 30, 2018).

Hackett acted improperly by knowingly hiring the Individual Defendants in the face of their employment agreements.  Hackett cannot intentionally ignore those agreements and hire the Individual Defendants to directly compete with Gartner.  *See* Restatement (Second) of Torts § 768 cmt. i (a defendant is not "justified in engaging the employee to work for him in an activity that would mean violation of the contract not to compete").  Hackett also lured Faramo away with promises of a lucrative compensation package (offer letter to Faramo promising a high six-figure salary, incentive compensation opportunities, and equity awards).  Such promises constitute improper means.  *See* Restatement (Second) of Torts § 766 cmt. m (noting that a defendant acts intentionally and improperly by inducing breach through the offer of better terms).  Hackett has likely already interfered, and will continue to intentionally interfere, with Gartner's contractual relationships with the Individual Defendants by inducing them to disclose trade secrets and confidential information.  This is evident from the Defendants' refusal to provide any assurances to Gartner to the contrary.  *See* Section II.E., *supra*.

Hackett's intentional interference with Gartner's contractual relationships with the Individual Defendants was improper.  Hackett knew the Individual Defendants were bound by restrictive covenants in their employment agreements and nonetheless induced them to breach by employing them in violation of those covenants.  Hackett undertook these actions in order to interfere with Gartner's business and to unlawfully compete in the marketplace.  As a result of Hackett's tortious interference with contractual relations, Gartner has suffered and will continue to suffer irreparable harm, including diminished value of its confidential information and loss of its competitive advantage.

### IV.    GARTNER WILL SUFFER IRREPARABLE HARM ABSENT
### A PRELIMINARY INJUNCTION.

Gartner has and will continue to suffer irreparable harm as a result of Defendants' actions, and irreparable harm is likely if the Court denies Gartner's motion for preliminary injunction.

**A.    Irreparable Harm Is Presumed Due To The Threatened Disclosure Of Gartner's Trade Secrets.**

Gartner has established actual, threatened, and imminent misappropriation of its trade secrets. The facts detailed herein demonstrate that the Individual Defendants have accepted employment with a direct competitor where they will necessarily rely upon and divulge Gartner's confidential information and trade secrets. *See* Sections III.A.2., III.A.2.b., *supra*. Faramo went as far as to send a number of internal Gartner documents containing confidential and trade secret information (explicitly marked "RESTRICTED DISTRIBUTION") to his personal email address in the month leading up to his last day of employment. *See* Section II.B.2., *supra*. Because the Individual Defendants' disclosure will irreparably impair the value of Gartner's trade secrets and confidential information, there exists a rebuttable presumption of irreparable harm. *Genworth Fin. Wealth Mgmt. v. McMullan*, 721 F. Supp. 2d 122, 128-29 (D. Conn. June 10, 2010) (citation omitted); *see also Frey*, 2011 WL 693013, at *9-10 (finding there is a presumption of irreparable harm when the plaintiff establishes that the defendant is in possession of his former employer's confidential information and accepts employment with a competitor).

In the context of a preliminary injunction to enforce a covenant not to compete, Connecticut courts rebuttably presume irreparable harm and the lack of an adequate remedy at law where the employer has demonstrated the reasonableness of its non-compete. *Naso*, 94 F. Supp. 3d at 299-300; *Bastanzi*, 2005 U.S. Dist. LEXIS 45268, at *25-28. Gartner has established that the Individual Defendants' covenants not to compete are reasonable and necessary to protect Gartner's legitimate business interests. *See* Section III.A.1.a., *supra*. Thus, Gartner "need not produce

substantial evidence that it has already or likely will suffer irreparable harm; the fact that [the employee] is working for a direct competitor in this particular industry in this particular market is sufficient." *Naso*, 94 F. Supp. 3d at 300.

**B.    Beyond The Presumption of Irreparable Harm, Gartner Has Established that It Has Suffered—and Will Continue To Suffer—Irreparable Harm.**

Even without the presumption of irreparable harm, Gartner has demonstrated it will suffer irreparable harm without the issuance of an injunction.  An injury is irreparable where, as here, there is no legal remedy providing full compensation or adequate redress because of the ineffectiveness of such legal remedy.  *See D'Amico v. Schiavone Realty & Dev. Corp.*, No. CVNH 8205110, 1982 Conn. Super. LEXIS 386, *4 (1982).  The Individual Defendants' employment at Hackett poses this precise risk, as Gartner's and Hackett's competition is ongoing, and the Individual Defendants are performing directly competitive functions in their Hackett roles.  *See* Section II.B.2. and II.C.2., *supra*.

The Individual Defendants breached their valid non-competes to join a direct competitor. Faramo is armed with knowledge of Gartner's proprietary sales methodology, sales tools and insights, pricing, and sales strategies, in addition to Gartner's broader sales processes, analyses and how to drive demand for Gartner offerings to obtain new business. *See* Sections II.B., III.A.1.b., *supra*. Van Decker is armed with knowledge of Gartner's proprietary and internal research that informed Gartner strategy and its research publications, client feedback, vendor briefings, the businesses operating in the markets, the priorities of these businesses, and how to establish meaningful and lasting relationships with these businesses that resulted in demand for Gartner products and services. *See* Section II.C. *supra*. For this reason, the Individual Defendants "will also have opportunities to use and disclose [Gartner's] trade secrets and confidential information, . . . [and their] use and disclosure of this information might well be unintentional.

Nevertheless, it is likely, if not inevitable, that such use and disclosure will occur." *Branson,* 921 F. Supp. 912-14. Under these circumstances, the threat of irreparable harm without injunctive relief exists. *See id.* (where employee violates non-compete and joins a competitor, and had access to trade secret information that would put employer at a serious competitive disadvantage, irreparable harm is likely); *see also McMullan*, 721 F. Supp. 2d at 128-30 (finding irreparable injury where the defendant employee used proprietary client list information to establish a competing entity). And the Individual Defendants agreed that violations of their respective employment agreements would cause Gartner irreparable injury.

Further, Gartner has no adequate remedy at law. The full extent of Gartner's injuries resulting from Defendants' conduct is ongoing and not easily ascertainable, and there is no legal remedy providing full compensation or adequate redress because of the ineffectiveness of such legal remedy. *See D'Amico*, 1982 Conn. Super. LEXIS 386, at *4. The Individual Defendants' employment with Hackett, and their imminent use and disclosure of Gartner's confidential information and trade secrets, will result in ongoing harm for which money damages will not suffice. *See, e.g.*, *HCAFranchise Corp. v. Alisch*, 2016 WL 10706285, at *7 (N.D. Ind. Aug. 12, 2016) (former employer had no adequate remedy at law for former employee's misappropriation of trade secrets because "monetary damages are insufficient to compensate for trade secret misappropriation"). And the Individual Defendants agreed that Gartner did not have an adequate remedy at law should they breach the non-competition and non-disclosure provisions of their respective agreements.

## V. THE BALANCE OF EQUITIES FAVORS GARTNER, AND THE ISSUANCE OF A PRELIMINARY INJUNCTION WILL NOT HARM THE PUBLIC INTEREST.

The balance of equities weighs in Gartner's favor given the clear and actual threat that the Individual Defendants' employment with Hackett presents to Gartner. To balance the equities, a

court must compare the irreparable harm risked by the moving party in the absence of injunctive relief against the irreparable harm risked by the non-moving party if injunctive relief is granted. *Jacobson & Co. v. Armstrong Cork Co.*, 548 F.2d 438, 442 (2d Cir. 1977). Here, the requested injunctive relief merely seeks to ensure that the Individual Defendants abide by what they already are legally obligated to do—adhere to and uphold their lawful and reasonable contractual obligations. *See Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014). And, for its part, Hackett would merely be required to honor valid and enforceable agreements, which is proper under the law. *See Korwek*, 2015 WL 5202902, at *17.

The Individual Defendants' employment agreements do not foreclose them from seeking employment in their given profession, or industry-wide; it simply prohibits them from directly competing with Gartner's offerings and soliciting Gartner clients. The Individual Defendants have other opportunities for employment that will not run afoul of their employment agreements; yet, they chose to work for Gartner's direct competitor, Hackett, in substantively similar roles. The burden of that choice should rest on the Individual Defendants. *See Naso*, 94 F. Supp. 3d at 300–01 (balance of harms favors granting injunction to prevent employee from directly competing in violation of non-compete, and where the covenant does not prevent employee from obtaining other employment).

Because the potential harm to Gartner from the Individual Defendants' employment with Hackett is great, including the harm caused by their inevitable use and disclosure of Gartner's trade secret information, while the potential harm to the Defendants is negligible, the balance of equities weighs strongly in favor of injunctive relief. This is particularly true given Gartner's strong likelihood of success on the merits of its claims.

Enforcing the Individual Defendants' employment agreements also will not harm the public interest. While there is a public interest in workplace mobility, the "public interest favors the enforcement of reasonably written restrictive covenants," as is the case here. *Korwek*, 2015 WL 5202902, at *17. And, of course, "[t]here is a substantial public interest in the protection of trade secrets and proprietary information . . . ." *Dymax Corp. v. Kalach*, No. 22-cv-00516, 2022 U.S. Dist. LEXIS 65404, at *3 (D. Conn. Apr. 8, 2022). Here, preventing misappropriation of Gartner's trade secrets—through valid and enforceable restrictive covenants—does not hinder, but rather serves, the public interest. *See 29 Main St. LLC v. United States Postal Serv.*, 2022 U.S. Dist. LEXIS 139928, *12 (D. Conn. Apr. 22, 2022) ("T]he public has an interest in the enforcement of contracts.").

## VI.    CONCLUSION

The arguments and evidence presented herein establish that Gartner is entitled to a preliminary injunction. Accordingly, Gartner respectfully requests the Court enter an injunction consistent with the Proposed Order submitted with Gartner's Motion for Preliminary Injunction.

Dated:  June 5, 2023

Respectfully submitted,

GARTNER, INC.


By:  */s Daniel A. Schwartz*
Daniel A. Schwartz (ct15823)
Sheridan L. King (ct31197)
**SHIPMAN & GOODWIN LLP**
One Constitution Plaza
Hartford, Connecticut 06103
Tel: (860) 251-5038
DSchwartz@goodwin.com
sking@goodwin.com

Christopher Collins
Bar No.: CT29869
**SHEPPARD MULLIN RICHTER & HAMPTON LLP**
30 Rockefeller Plaza
New York, NY 10112
Tel: (212) 653-8700
Fax: (212) 653-8701
ccollins@sheppardmullin.com

Kevin M. Cloutier, Esq.
(*pro hac vice* admission pending)
Illinois Bar No.: 6273805
**SHEPPARD MULLIN RICHTER & HAMPTON LLP**
321 North Clark Street, 32nd Floor
Chicago, Illinois 60654
Tel: (312) 499-6300
Fax: (312) 499-6301
kcloutier@sheppardmullin.com
koblak@sheppardmullin.com

Eric Schlichter, Esq.
(*pro hac vice* admission pending)
Texas Bar. No. 24007994
**SHEPPARD MULLIN RICHTER & HAMPTON LLP**
700 Louisiana Street, Suite 2750
Houston,  TX 77002
Tel: (713) 431-7100
Fax No.:  (713) 431-7101
eschlichter@sheppardmullin.com

*Counsel for Plaintiff Gartner, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 5, 2023, I sent copies to the foregoing document via e-mail to

the following:

Todd R. Legon
Legon Fodiman & Sudduth, P.A.
3225 Aviation Avenue, Suite 301
Miami, FL  33133
tlegon@lpflaw.com

*Counsel for Defendants The Hackett Group, Inc.,*
*Jeffrey Faramo, and John Van Decker*


*/s/ Sheridan L. King*
Sheridan L. King